Bolivar YANEZ, Plaintiff,

v.

THE CITY OF NEW YORK, New York City Police Department, and Police Officers Corey Bogus, Richard Thompson, Joseph Morris, James Lyons, Scott Lewis, Donald Solt and Deserie Hernandez Defendants.

No. CV–94–5925 (JMA).

United States District Court,
E.D. New York.

Nov. 6, 1998.

Amy Marion, Cheda & Sheehan, Jackson Heights, NY, for Plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, New York City (Kevin J. Smith, Assistant Corporation Counsel), for Defendants.

### MEMORANDUM AND ORDER

AZRACK, United States Magistrate Judge.

By stipulation dated March 6, 1998, the parties consented to have this case presided over by me for all purposes, including entry of judgment, pursuant to 28 U.S.C. § 636(c). Accordingly, I have considered defendants' motion for summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

This action arises out of an automobile accident between plaintiff Bolivar Yanez ("Yanez") and New York City Police Officer Richard Thompson ("Thompson"). This collision led to Yanez's arrest and subsequent acquittal on charges of driving while intoxicated under New York Vehicle and Traffic Law, § 1192(2). In his complaint, plaintiff states causes of action under 42 U.S.C. § 1983, for false arrest, false imprisonment,

malicious prosecution, negligence in hiring and retaining, negligence in performance, and negligence in training and supervision. Similar claims are made under New York State Law. Also, claims of conspiracy are made under § 1983. Finally, plaintiff seeks recovery under New York Insurance Law § 5102(d) for personal injuries suffered in the accident.

All claims against defendant New York City Police Department ("NYPD") are hereby dismissed, as plaintiff has conceded that the NYPD is not a proper party to this action. All other claims are discussed herein.

### FACTUAL BACKGROUND

On September 23, 1993, at about 7:30 AM, Bolivar Yanez was driving home from a family gathering he attended the previous night at his brother-in-law's home in Queens, New York. (Yanez Dep., Pl.Ex. J at 28.) Yanez's passengers were his brother-in-law, Francisco Guaranda ("Guaranda") and Guaranda's wife. (Guaranda Dep., Pl.Ex. K at 20.) Yanez planned on dropping off his passengers and then returning to his home. (Pl.Ex. J at 31–32.)

At approximately 7:50 AM, Yanez was making a left turn from Freedom Drive onto Myrtle Avenue, in Queens, when he was involved in a collision with a car driven by Richard Thompson. (Thompson Dep., Def. Ex. D at 8.) Thompson, then attached to the NYPD's 103rd Precinct, was on his way to a temporary assignment at the 102nd Precinct, along with fellow officers Deserie Hernandez, Donald Solt and Scott Lewis. (Excerpt from Yanez Trial, Def. Ex. I at 6.) Although Thompson was on police business, he was using his personal vehicle to shuttle the group of officers to the 102nd Precinct assignment. (Id.)

The circumstances surrounding the collision and subsequent events form the basis of the case before this Court. Yanez maintains that he was attempting to complete his turn, but after he completed the left turn onto Myrtle Avenue, his car stalled. (Pl.Ex. J at 36.) Yanez claims that he then tried to maneuver his car off the main lane of the

road, and into a parking space. (*Id.*) Yanez was trying to restart the car, but he was suddenly hit from behind by Thompson's car. (*Id.*) Guaranda, one of Yanez's passengers, supports Yanez's description of the collision.

Officer Thompson's version of the accident and the subsequent events is far different than that of Yanez. Thompson states that he was headed west on Myrtle Avenue, approaching Freedom Drive. (Def. Ex. I at 7.) As Thompson proceeded to the intersection, he claims that Yanez drove through the stop sign on Freedom Drive and entered the intersection with Myrtle Avenue. (*Id.* at 10.) While Yanez's car was in the intersection, Thompson states that Yanez stopped his car across the yellow line, with half of the car in the eastbound lane of Myrtle, and the other half in the westbound lane. (*Id.*) Thompson at first swerved into the eastbound lane, but there was a bus coming in the opposite direction. (*Id.*) Thompson then turned his car back into the westbound lane, but with no other options, he collided into the rear of Yanez's car. (*Id.* at 10–11.)

The sequence of events following the collision is also in dispute. Yanez maintains that he exited his car, proceeded to Thompson's car, where Thompson was already standing. (Pl.Ex. J at 43.) Yanez claims that Thompson did not want to report the accident, and told him that each party should fix the damage to their own cars. (*Id.* at 44–45.) Yanez refused this offer since his car had sustained more damage than Thompson's vehicle. (*Id.* at 45.) Yanez asked Thompson for his license and registration, but Thompson allegedly refused to provide these items, although Yanez did provide them to Thompson. (*Id.* at 47.) At that point, other NYPD officers arrived at the scene.

Thompson claims that after the collision, he exited his vehicle and had a conversation with Yanez. (Pl.Ex. I at 11.) During this conversation, Thompson recalled that Yanez asked for Thompson's license and registration, but Thompson made no such request of Yanez.[1] (*Id.* at 19.) Thompson noted that Yanez had alcohol on his breath, and that Yanez's speech was slurred. (*Id.* at 11.) It was Thompson's opinion that Yanez was intoxicated at the time of the accident. (*Id.* at 19.) Thompson's conclusion is countered by one of Thompson's passengers, Officer Donald Solt ("Solt"). Solt recalls that just after the accident, he had the chance to observe Yanez from a distance of only five or six feet away. (Solt Dep., Def. Ex H at 54.) At this distance, Solt did not notice any signs of alcohol on Yanez's breath. (*Id.* at 54–55.)

NYPD Officers Corey Bogus ("Bogus") and James Lyons ("Lyons") of the 103rd Precinct responded to the scene within a few minutes of the accident. (Bogus Dep., Def. Ex. F at 5–6.) Upon arriving, Bogus first spoke to the occupants of Thompson's vehicle. (*Id.* at 6–7) Bogus then approached Yanez and obtained his license and registration. (*Id.* at 8.) Officer Bogus then started to investigate the accident and complete the necessary paperwork. (*Id* ) As Bogus surveyed the scene, he spoke to Thompson, Yanez and a bystander, Vincent Matthews ("Matthews"). (*Id.* at 7–9.) Bogus states that when he spoke to Yanez, there was a strong odor of alcohol on Yanez's breath. (Def. Ex. I at 31.) When Bogus asked Yanez if he was drinking, Yanez replied that he had five beers the previous night. (*Id.* at 31–32.) Additionally, Bogus says that although Yanez's speech was slurred, and his eyes were bloodshot, he did not administer a roadside sobriety test. (*Id.*) Bogus determined that Yanez was under the influence of alcohol, so he arrested Yanez and brought him in for further testing. (*Id.* at 32.)

Yanez tells a different version of the arrest. Yanez claims that the investigating officer, who he cannot name, asked him about the accident. (Pl.Ex. J at 51.) Yanez told his version of the incident, and he was then asked to "walk," presumably as part of some type of field sobriety test. (*Id.* at 51–52.)

---

1. In Thompson's deposition testimony for this case, which occurred after his testimony in Yanez's criminal trial, Thompson tells a different story. Thompson now says that Yanez was "screaming" when he got out of the car. (Thompson Dep., Pl.Ex. D at 36.) Thompson does not now recall speaking with Yanez about an exchange of license or registration. (*Id.* at 37.) Strangely, Thompson now cannot recall having any conversation with Yanez before police arrived at the accident scene. (*Id.* at 37.)

Yanez was asked by the officer how much he drank the previous night, and Yanez replied that he had drank two beers that evening. (*Id.* at 52.) Additionally, as part of some sort of sobriety test, the police officer asked Yanez to touch his face and put his fingers on his nose. (*Id.*) Then, at approximately 8:20 that morning, Yanez was handcuffed, and told that he was being arrested for driving while intoxicated. (*Id .* and Pl.Ex. I at 32.)

Yanez was driven to the 112th Precinct, where the NYPD Highway Patrol conducts Breathalyzer tests in Queens. (Pl.Ex. I at 32.) Bogus and Yanez arrived at the 112th Precinct at about 8:50 AM, and waited until approximately 9:15 AM when Officer Joseph Morris ("Morris") of the NYPD Highway Patrol arrived. Morris states that when he arrived at the 112th Precinct, he had a brief conversation with Bogus, limited to matters pertaining to the arrest paperwork. (Morris Dep., Def. Ex. E at 9.) During his deposition, Bogus said that Morris performed a coordination test on Yanez, however, in his previous criminal trial testimony, Bogus claimed that Morris only administered a Breathalyzer examination. (Pl.Ex. F at 13, Pl Ex. L at 42.) In his deposition testimony, Morris stated that he waived the physical coordination test for Yanez because Yanez was not fluent in English. (Def. Ex. G at 7.)

Morris, in the presence of his partner Kompass, and Bogus,[2] showed Yanez a standard tape prepared by the NYPD. This tape, which is in Spanish, is designed to inform Spanish speaking suspects in alcohol related driving offenses of their rights before an NYPD officer administers a Breathalyzer test. (*Id.* at 10, 18.) After viewing the tape, Yanez agreed to take the Breathalyzer test.[3] The test administered by Morris indicated that Yanez's blood alcohol level was 0.10%, which is over New York's legal limit of 0.09%. Yanez was later charged with violating Section 1192(2) of the New York Vehicle and Traffic Law.

In November 1994, Yanez's criminal case for driving under the influence was tried before a jury in the Criminal Court in Queens. (Pl.Ex. I.) During the four day trial, Thompson, Bogus and Solt testified for the prosecution. (*Id.*) However, Officer Morris, who administered the breathalyzer, did not testify. (*Id.*) Yanez was found not guilty of both counts of driving under the influence of alcohol. (*Id.*)

Yanez claims to have sustained various injuries from the collision with Thompson. Yet, immediately after the accident, Yanez did not request treatment for his alleged injuries. (Pl.Ex. J at 54 .) However, after the incident, Yanez was out of work for four days. (Pl.Ex. J at 8.) Yanez claims that his injuries have restricted his abilities as a restaurant worker, since he now needs a support belt to perform his duties. (*Id.* at 6–8.) In October 1993, approximately one month after the accident, Yanez sought treatment at the office of a chiropractor, Dr. Arce. (Krishna Decl. at 1.) Yanez was diagnosed with hyperextension/hyperflexion neck injury, lumbosacral sprain/strain, sprain/strain to cervical area and shoulder and joint pain. (Def.Ex. J.) Yanez claims that he suffers from these back injuries, which limit his ability to lift heavy plates and bend over tables. (Yanez Decl. at 1.) Yanez also experiences periodic pain and swelling in his arm. (*Id.*)

In addition to the back and arm injuries, Yanez claims that approximately eight months after the accident, he began to suffer pain in his mouth and jaw, ringing in his ears, an inability to open his jaw properly and problems chewing. (Def. Ex. D at 84–85, Pl. Ex C at 1.) At the suggestion of his chiropractor, Yanez consulted with a dentist. (*Id.*) Yanez's dentist, Dr. Robert S. Richter, found that Yanez suffered injuries that were caused by the "rapid, sudden and excessive opening of the jaw joint on impact." (Pl.Ex. C at 2.) Richter believed that Yanez's jaw injuries were consistent with· an accident

---

**2.** Bogus, in his deposition testimony, does not mention the presence of Kompass, but he does recall Lyons being present during these events. (Def. Ex.G at 12–13.)

**3.** Kompass only videotaped Yanez's viewing of the Spanish tape, not the actual test itself, or

Yanez's response to the questions on the tape concerning waiver of rights. (Pl.Ex. G at 13–16.) Morris says that this procedure, which was supposedly standard in the NYPD at the time of these events, has been changed. (*Id.* at 16.)

such as the incident of September 23, 1993. (*Id.*) Richter recommended a course of therapy which included the fitting of a oral orthotic device. (*Id.* and Pl. Ex C at 88.)

Defendants, however, argue that Yanez has not suffered any serious injury. Dr. Edward S. Crane, an orthopedic surgeon retained by defendants, reviewed all the medical, chiropractic and dental records submitted by Yanez. (Crane Decl. at 1.) However, Dr. Crane has not personally conducted a physical examination of Yanez. Although Crane provides no opinion concerning Yanez's jaw and dental problems,[4] he does conclude that Yanez "...at most, suffered mild muscle strain as a result of the automobile accident underlying this lawsuit." (*Id.* at 2.)

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "no genuine issue as to any material fact [exists] and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The initial burden of demonstrating the absence of a genuine issue of material fact rests with the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to set forth specific facts that demonstrate that a genuine triable issue exists. *Id.* at 324, 106 S.Ct. 2548. In considering a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Gibson v. American Broadcasting Co. Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989); *United States v. 44 Autumn Avenue, Brooklyn, New York*, 156 F.R.D. 26, 31 (E.D.N.Y. 1994). Nevertheless, "a summary judgment motion will not be defeated merely on the basis of a 'metaphysical doubt' about the facts or on the basis of conjecture or surmise." ' *Maier–Schule GMC, Inc. v. General Motors Corp.*, 850 F.Supp. 1095, 1100 (W.D.N.Y.1994), *aff'd*, 62 F.3d 1412 (2d Cir. 1995) (quoting *Matsushita Elect. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)).

### B. FALSE IMPRISONMENT AND FALSE ARREST CLAIMS

Plaintiff brings claims under New York State Law and Section 1983 for false arrest and imprisonment based upon the arrest on September 23, 1993 by defendants Bogus and Lyons. Defendants claim that the arrest was supported by ample probable cause. Defendants explain that the circumstances of the accident, the observations of Bogus, the statements of Thompson and an eyewitness all support a finding of probable cause. Since there is probable cause, defendants argue, the false arrest and false imprisonment claims should be dismissed.

■ Claims brought under Section 1983 are guided by state tort law. *See, Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995). False arrest and false imprisonment claims are essentially the same under New York law. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d. Cir.1995), *citing, Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992). The four elements of a false arrest and imprisonment claim are (1) the defendant had intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; (4) the confinement was not otherwise privileged. *See, Labensky v. County of Nassau*, 6 F.Supp.2d 161, 175 (E.D.N.Y.1998); and *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). To succeed in a false arrest or false imprisonment claim, a plaintiff must demonstrate an absence of probable cause. *Zanghi v. Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir.1985).

■ Probable cause to arrest exists when law enforcement officials have knowledge of, or reasonably trustworthy information about facts and circumstances sufficient to warrant a person of reasonable caution to believe that an offense has been committed

---

4. Since Dr. Crane is an orthopedic surgeon, it is questionable whether he would be qualified to provide an opinion concerning Yanez's dental symptoms.

by the person arrested. *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Therefore, if there are disputes over relevant facts, then the issue of whether probable cause existed at the time of the arrest are matters best left to the jury. *See, e.g., Weyant,* 101 F.3d at 852; *Johnson v. City of New York,* 940 F.Supp. 631, 636 (S.D.N.Y.1996), *citing, Moore v. Comesanas,* 32 F.3d 670, 673 (2d Cir.1994).

In the case before me, there are disputes as to the events surrounding the collision which raise sufficient questions regarding Officer Bogus's finding of probable cause to preclude summary judgment. After a thorough review of the record, the cause of the accident is not entirely clear. The sequence of events just after the accident are subject to varying accounts. Most significantly, Yanez's condition immediately following the accident is subject to reasonable dispute. Taken together, these factors compel me to deny summary judgment on the false arrest and false imprisonment claims as to defendants City of New York, Officers Bogus, Lyons, Thompson and Morris, but to grant summary judgment as to defendants Officers Lewis, Solt and Hernandez.

Here, for illustration purposes, I note that there are three different scenarios for the accident. Yanez maintains that just as he turned, his car stalled. Yanez then maneuvered his car into the parking lane, where he was struck from behind by Thompson. Thompson maintains that Yanez's car was stalled in the intersection, with half of the car on each side of the double yellow dividing line, when his car collided with Yanez's vehicle. The statement of an independent witness, Vincent Matthews, suggests that Yanez made a bad, or possibly impaired, driving decision by attempting the turn without leaving enough room for oncoming traffic. While the varying accounts, standing alone, are not dispositive on the false arrest and imprison-

ment claims, they demonstrate the fundamental differences in the various versions of the event.

The subsequent sequence of events, including the exchange between Yanez and Thompson just after the collision, is also subject to debate. While the events just following the accident do not directly factor into the decision by Bogus to arrest Yanez, they do demonstrate that there are reasonable questions as to whether Bogus had probable cause to arrest Yanez. The inconsistent testimony of Thompson in this matter also raises questions as to Yanez's physical state at the time of the arrest, which then undermines the probable cause for the arrest.

With regards to Yanez's physical condition just before his arrest, the accounts vary widely. At times, defendants' counsel has attempted to minimize important discrepancies in the testimony of their clients. For example, at trial, Thompson stated that he had a "conversation" with Yanez immediately after the accident. However, in his recent deposition testimony, Thompson states that Yanez was "screaming" when he got out of the car. These seemingly minor details are important in the instant case, since defendants claim that the initial roadside arrest of Yanez was based entirely on the officers' observation and assessment Yanez's physical condition.

There are more troubling discrepancies in Thompson's testimony. At various points in his recent deposition, Thompson could not recall many simple, but important events which occurred in the initial interaction with Yanez. Although these details seem somewhat minute, they are vital when taken together as a whole. These small details are some of the best evidence of Yanez's condition just after the accident, and provide independent corroboration of probable cause and Bogus's decision to arrest Yanez. However, Thompson has been inconsistent in his testimony. For example, he has not been able to recall if Yanez was screaming after the accident, if they discussed an exchange of paperwork after the accident, or, if they engaged in *any* conversation after the accident.

Plaintiff has characterized Thompson's memory lapses as "notably evasive." While

I would not go that far, the lapses are troubling. Thompson is a police officer, therefore, his job requires an ability to recall details of events such as the collision with Yanez. Thus, it is notable that Thompson cannot recall simple events surrounding the accident. Thompson was driving in his own vehicle, on police business, with three other uniformed officers as passengers. His colleagues suffered injuries in the collision, and Thompson's car suffered substantial damage. Given these circumstances, it is striking that Thompson's memory concerning that morning is not clear. Moreover, Thompson later testified at Yanez's criminal trial, with certainty and clarity, about the event and many of the specific points which he cannot now recall. While Thompson's deposition testimony is not necessarily evasive, these memory lapses are significant in generating questions of fact to defeat the motion for summary judgment.

Another important factor that raises questions regarding probable cause is the presence of an alcohol smell that was supposedly on plaintiff's breath at the time of his arrest. At trial, Thompson stated that he could smell the alcohol on Yanez's breath, however, he gave a markedly different answer in his deposition testimony:

Q. To the best of your recollection, do you recall whether or not Mr. Yanez smelled of alcohol or had any sort of alcohol smell on his breath?

A. I remember slurred speech. (Thompson Dep. at 44.)

In providing this "non-answer" to a direct, straightforward question, the only fair inference that can be drawn is that he now does not now remember the smell of alcohol on Yanez's breath. Thompson also cannot now recall if Yanez had bloodshot eyes or walked unsteadily. Yanez's breath, speech and walk were all factors in Bogus's decision to arrest Yanez. The shifting testimony of Thompson, who was the first on the scene to observe and speak to Yanez, raises additional questions concerning probable cause in plaintiff's arrest.

Thompson's wavering on the issue of the presence of an alcoholic odor is contrasted by Solt's deposition testimony. Solt clearly recalled that he was five or six feet away from Yanez, who was screaming, yet he did not detect alcohol on plaintiff's breath. Bogus, on the other hand, maintains that he could smell alcohol on Yanez's breath. Here, defendants themselves cannot agree on whether Yanez smelled of alcohol. This disagreement among the defendants themselves as to whether this key component of probable cause for the arrest existed is significant.

Another factor throwing probable cause into dispute is whether a roadside sobriety test was administered to Yanez. Yanez has not wavered in his contention that Bogus administered such a test to him just before arrest. Bogus however, claims that no such test was administered. Whether a sobriety test was actually administered is vital to determining whether Bogus had probable cause to arrest Yanez. Additionally, Bogus stated at the criminal trial that Morris did not administer a coordination test. However, in his deposition, Bogus now recalls that Morris did administer such a test, although Morris claims no coordination test was administered at the 112th Precinct.

Even if we assume, in arguendo, that defendants' contention is true, a coordination test was never administered, then all that remains to sustain the initial probable cause are the circumstances of the accident and the observations of the various officers concerning Yanez. Since the circumstances of the accident are subject to a reasonable dispute, and defendants cannot agree on Yanez's physical state or behavior at the time of arrest, it is clear, that as a matter of law for purposes of summary judgment, that there was not sufficient probable cause to support Yanez's arrest.[5] I therefore find that the

---

5. In arguing for summary judgment, defendants have placed great weight on the holding in *Haussman v. E.S. Fergus*, 894 F.Supp. 142 (S.D.N.Y.1995), which granted summary judgment to defendant police officers. Even if the case were controlling, it is easily distinguishable, and therefore, not dispositive.

First, in *Haussman*, it was undisputed that plaintiff was seen driving with his high beam headlights on when it was not necessary, which is an indicator that the driver of the vehicle was possibly impaired. *Id.* at 148. This created a sound basis for the initial stop. This is unlike the

claims must stand as to Bogus, Lyons, Thompson and New York City.

With regard to Morris, I will deny the motion for summary judgment on the false arrest and false imprisonment claims. Plaintiff's theory of how Morris's administration of the Breathalyzer examination was faulty is not entirely clear. However, in viewing the surrounding circumstances in a light most favorable to plaintiff, there are continuing questions as to probable cause. It has not been explained, other than Morris's vague reference to an NYPD "standard procedure," why Yanez's viewing of the waiver translation was videotaped, but his waiver of rights or the Breathalyzer examination itself were not recorded. It is also troubling that Morris, the Breathalyzer administrator, was never called at Yanez's four day criminal trial. Bogus's *conflicting* testimony on whether Morris administered a coordination test also raise questions as to what occurred at the 112th Precinct. Therefore, I will deny summary judgment for Morris on these claims.

▉ Summary judgment on the claims for false arrest and false imprisonment are granted as to Officers Solt, Lewis and Hernandez. Plaintiff has not demonstrated, other than their presence in Thompson's vehicle, any active involvement in Yanez's arrest. Additionally, while Solt was a witness to these events, he was not involved in the arrest to such an extent that plaintiff has demonstrated liability. The record does not show any level of interaction or participation between these defendants and Yanez or the arresting officers such that Lewis, Hernandez and Solt could be held liable for the arrest.

## C. MALICIOUS PROSECUTION CLAIMS

▉ To prove a malicious prosecution claim under a Section 1983 or New York State law, a plaintiff must establish that (1) defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding and (4) that the criminal proceeding was instituted with actual malice. *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir.1991) (citations omitted).

▉ As stated above, there remains a reasonable question of law as to whether the initial arrest and subsequent criminal proceeding were initiated with the support of sufficient probable cause. In the subsequent criminal case, Yanez was acquitted, creating a disposition in his favor. Finally, as will be discussed, plaintiff has offered a viable motive, creating a question of malice, in the institution of proceedings against him. Accordingly, summary judgment is denied for defendants Bogus, Lyons, Thompson, Morris and the City of New York. Summary judgment is granted for all other defendants.

## D. QUALIFIED IMMUNITY ON SECTION 1983 CLAIMS

Defendants assert that in the alternative to their defenses on the false arrest, false imprisonment and malicious prosecution claims, they are entitled to summary judgment upon the basis of qualified immunity. However, given my expressed concerns over the actions of the police officers in the arrest of Yanez, summary judgment on the basis of qualified immunity is inappropriate for individual defendants Bogus, Lyons, Thompson and Morris.

▉ "Government officials, performing discretionary functions, are shielded from personal liability 'insofar as their conduct

---

instant case, where the circumstances surrounding the accident, which later led to the arrest, are in dispute. Second, in the cited case it was undisputed that a field sobriety test was administered to plaintiff prior to arrest, which provided another basis for probable cause. *Id.* However, it is disputed in the matter before me whether such a test was given to Yanez.

Finally, defendants claim that *Haussman* is similar to this case because in *Haussman*, "only" one of the two arresting officers could smell

alcohol on the driver's breath. In reading the published opinion, I find that the *Haussman* court merely states that one of the officers smelled alcohol on the driver's breath. There is no mention of the other officer's observation, or an affirmative statement declaring that the other officer made no such observation. That is different than the instant case, where the record clearly demonstrates that defendants have varying accounts on this point.

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir.1990), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990), *quoting, Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Government officials are protected by the qualified immunity defense if, at the time they acted, it was objectively reasonable for them to believe their acts were lawful. *Id.* Although a denial of immunity on a motion for summary judgment may be immediately appealable, pretrial resolution of the qualified immunity defense may be defeated by a factual dispute. *Id.*

 In the case before me, I will not grant qualified immunity at this stage of the proceedings to Bogus, Lyons, Morris and Thompson. As stated above, there is a question of fact that remains to be resolved as to whether probable cause existed to support the arrest of Yanez. The circumstances of the arrest, and the shifting accounts of these events strongly suggest that if, in fact, probable cause was absent from Yanez's arrest, this was known to some or all of the individual defendants. Qualified immunity provides protection to "[A]ll but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, summary judgment on qualified immunity is denied to Bogus, Lyons, Thompson and Morris, but granted to Solt, Lewis and Hernandez.

## E. CLAIMS OF CONSPIRACY UNDER SECTION 1983

 "An action for conspiracy will lie under Section 1983 when it is shown that defendants have planned or acted in concert under color of law to deprive a person of his or her Constitutional rights." Isidore Silver, 1 *Police Civil Liability* § 8A.13 (1998). *See e.g.,Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Since conspiracy claims have sufficiently established antecedents in the common law of torts, they can be used for proving liability in Section 1983 actions, including actions for false arrest. *Mitchell v. City of Hartford*,

674 F.Supp. 60, 66 (D.Conn.1986). To establish a prima facie case of a Section 1983 conspiracy a plaintiff must demonstrate an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and actual deprivations of those rights in the forms of overt acts in furtherance of those agreements. *See, e.g, Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

 In plaintiff's complaint, a claim is made that the individual defendants conspired to falsely accuse Yanez of driving while intoxicated after Thompson requested that Yanez not report the accident. The original complaint states:

"That after plaintiff refused defendant RICHARD THOMPSON's request not to report the accident, defendants COREY BOGUS and JAMES LYONS arrived at the scene. At this time defendants, COREY BOGUS, RICHARD THOMPSON, JAMES LYONS, DONALD SOLT, SCOTT LEWIS, AND DESERIE HERNANDEZ wrongfully and unlawfully conspired to falsely accused plaintiff of driving while intoxicated..."

"The plaintiff was then further unlawfully detained and held at the 112th precinct in Queens County. At this time, plaintiff was again unlawfully accused and charged by defendants RICHARD THOMPSON and JOSEPH MORRIS..."

Here, the complaint states the times, locations and circumstances by which the alleged conspiracies developed. Obviously, since plaintiff was the victim of the alleged conspiracy, and not a participant, his complaint cannot provide much more than an recitation of where, when and how he believes that the alleged conspiracy was planned and executed. Yanez alleges conspiracy with specificity sufficient to survive a motion for summary judgment, however, the record developed thus far is insufficient to support the conspiracy claims against Lewis, Hernandez and Solt. The record does not show that Lewis, Hernandez or Solt were significantly involved in the conversations preceding the arrest, the arrest itself, or the post arrest examination. Therefore, I am granting summary judgment

to Solt, Lewis and Hernandez, but not to defendants Bogus, Lyons, Thompson and Morris.

## F. PLAINTIFF'S CLAIMS AGAINST THE CITY, INCLUDING NEGLIGENT HIRING, RETENTION, SUPERVISION AND TRAINING

Plaintiff claims that the City of New York was negligent in its hiring, retention, supervision and training of individual defendants such that the City is liable under federal and state law for the acts of the individual defendants. The municipal defendant avers that it shielded from liability, and is entitled to summary judgment because plaintiff has not produced evidence that, as a matter of law, would establish municipal liability. In order to state a Section 1983 claim against a municipality, a plaintiff must allege that a person acting under color of state law committed acts that denied plaintiff of a right, law, privilege or immunity guaranteed by the Constitution or law of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Municipal liability in section 1983 actions cannot be founded on the principle of respondeat superior. *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a plaintiff can succeed by establishing "[A] direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In describing the proof needed to demonstrate policy or custom under *Monell*, Chief Judge Sifton of this District has stated:

"To prove the existence of a policy or custom, plaintiff must establish one of the following:

(1) a formal policy, officially promulgated or adopted by the municipal defendant, or

(2) that an official or officials responsible for establishing final policy with respect to the subject matter in question took action or made a specific decision which caused the alleged violation of plaintiff's constitutional rights, or

(3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a "custom or usage" and proof of this practice is so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, or

(4) the failure to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights with such a failure amounting to a "deliberate indifference" to the rights of those with whom the municipal employees will come into contact." *Ariza v. City of New York*, 1996 WL 118535, *3 (E.D.N.Y.1996) (citations omitted).

Plaintiff's *Monell* claims are the type founded in prongs three and four of the *Ariza* test. Plaintiff believes that he was falsely arrested and imprisoned by defendants in an effort to cover-up the accident, and Thompson's alleged request that Yanez not report the accident. This is the type of activity described in the third prong: lower echelon officers hiding the illegal acts of their peers, participating in the "wall of silence", to such an extent that their superiors acquiesce in the behavior by inaction against the cover-up. Additionally, Yanez believes that faulty recruitment, training, supervision and retention of individual defendants spell out a claim as described above in the fourth type of *Monell* liability.

The Mollen Commission was established to investigate corruption in the NYPD and make recommendations for changes to prevent further NYPD corruption. *See, White–Ruiz v. City of New York*, 983 F.Supp. 365, 380–81 (S.D.N.Y.1997), (detailing the purpose and findings of the Mollen Commission). Since the Mollen Commission's final report was issued in 1994, the Commission's findings, and their relevance in Section 1983 litigation, has been subject to interpretation in this District and by my colleagues in the Southern District of New York. *See, e.g., Shaw v. City of New York*, 1997 WL 187352, (S.D.N.Y. Apr.15, 1997); *White–Ruiz v. City of New York*, 1996 WL 603983 (S.D.N.Y. Oct.22, 1996)("*White–Ruiz I*") and 983 F.Supp. 365 (S.D.N.Y.1997) ("*White–Ruiz II*"). As with all problems involving evidence

and proof, the determination of admissibility is dependent upon purpose and context. For example, in *Domenech v. City of New York*, 919 F.Supp. 702 (S.D.N.Y.1996), that Court held that the Mollen Commission report and related testimony failed to create a genuine issue of material fact as to the existence of custom or practice of retaliation in a gender discrimination case. However, in *White–Ruiz* I, another gender discrimination retaliation case, the court held that the Mollen report was admissible, since the retaliation claimed by plaintiff bore a "striking resemblance" to the methods of retaliation described in the Commission's report, and was also in retaliation for plaintiff's attempts to report the corruption of her fellow officers. *White–Ruiz* II, 983 F.Supp. at 392.

 Here, the connection between the Mollen Commission's findings, and the events in the instant case are too remote for me to allow these *Monell* claims to proceed. Yanez tries to use the Mollen report to bolster his *Monell* claims that there was a constructive acquiescence by defendants' superiors to a "custom" of allowing lower level officers to hide all of their colleagues wrongs. However, plaintiff has not adequately explained the connection between the alleged plot among these police officers and the "blue wall of silence" described in the Mollen report. While the Mollen Commission found that there was a practice of officers defending each other against charges of corruption, the link in this instance is tenuous at best. If plaintiff's argument is believed, then I would have to equate the serious, criminal behavior described in the Mollen Report, such as retaliation against officers who reported bribe taking, with the behavior of these officers. Taken to its logical conclusion, plaintiff's argument would allow use of the Mollen report to defeat summary judgment in almost any claim of police wrongdoing involving more than one officer. Based upon the record before me, the *Monell* claims cannot proceed with only the Mollen report as evidence of practice or custom by the NYPD of allowing these wrongful acts.[6]

Additionally, Yanez asserts *Monell* claims for negligent hiring, training, retention and supervision. While the Mollen report addresses problems in NYPD personnel procedures, I cannot find the connection between those procedures, the individual defendants, and plaintiff's *Monell* claims. No evidence has been offered regarding the officers' pre-employment background such that the City was on notice that they would commit wrongful acts. Additionally, the record does not reflect any proof that the individual defendants' NYPD work histories would have fairly placed their abilities into question at the time of the Yanez incident. Plaintiff has not identified any NYPD training or personnel procedures which can fairly be linked to this case. Thus, summary judgment is granted to defendants on all *Monell* claims.

## G. PLAINTIFF'S CLAIM OF "SERIOUS INJURY" UNDER NEW YORK INSURANCE LAW SECTION 5102(d)

In addition to claims relating to the alleged violations of his civil rights, Yanez makes tort claims for personal injuries that he suffered as a result of the collision with Thompson. These claims are governed by New York's "no-fault" law, which precludes recovery for non-economic loss arising out of negligence in the use or operation of an automobile except where the claimant has a serious injury. N.Y. Insurance Law Section 5104(a). Under Section 5104(a), recovery is permissible only where there is serious injury, as defined in Insurance Law Section 5102(d):

> "Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent use of a body organ, member function or system; permanent consequential limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing all of the material acts which constitute such a person's usual and customary daily activities for not less

---

**6.** Even if I allowed the *Monell* claims to continue, plaintiff would be unable to prove these claims at trial, since the Mollen report would probably be inadmissible evidence. *See, e.g.,*

*Jackson v. City of New York*, 93–CV–174, slip op., (E.D.N.Y. Apr. 24, 1996)(rejecting admission of the Mollen report at trial for the purpose of proving *Monell* claims.)

than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

Any injury not falling into one of these categories is considered to be "minor" and the New York Legislature intended that matters involving these minor injuries be kept out of court. *Licari v. Elliott*, 57 N.Y.2d 230, 236, 455 N.Y.S.2d 570, 572, 441 N.E.2d 1088 (N.Y.1982). The scheme of the "no-fault" system requires that the Court determine whether the plaintiff has a serious injury within the meaning of the statute. *Id.* at 236, 455 N.Y.S.2d 570, 441 N.E.2d 1088. However, to be entitled to summary judgment, it is defendant's burden to put forward sufficient evidence that the plaintiff did not suffer "serious injury". *Hoffman v. Nogaro*, 667 N.Y.S.2d 943 (2d Dept.1998). If the defendant does not satisfy this burden, then the plaintiff is not required to come forward with proof that plaintiff suffered a serious injury. *Id.*

Yanez contends that he has suffered injuries to his back, arm, shoulder and jaw, along with an occasional ringing sound in his ears. Yanez further claims that he missed work due to his injuries, that he was restricted in his abilities to work and that he still suffers from back and arm pains on a regular basis. Based on Yanez's affidavits and motion papers, his complaints fall into three of the "serious injury" categories established by the legislature: (1) permanent consequential loss of a body function or system; (2) significant loss of body function or system; and (3) an inability to perform customary and usual activities for not less than ninety of the one hundred and eighty days after the occurrence of injury (the "90/180 day rule").

At the time of the accident, Yanez did not complain of injury, ask to go to the hospital, or request any medical attention. Approximately one month later, he sought treatment from a chiropractor for the back, neck and shoulder pain. The chiropractor diagnosed Yanez as having hyperextension/hyperflexion neck injury, lumbosacral separation, sprain/strain to the cervical area, and shoulder joint pain. A contemporaneous examination revealed a 9% limitation in the cervical spine, a 4% limitation in the lumbosacral spine and a 1% limitation in the thoracic spine. Also, magnetic resonance images (MRI) taken of Yanez's back indicate injury compatible with muscle strain.

Yanez's treatment regimen for the back and shoulder problems is unclear. In his deposition, given in March 1998, Yanez indicates that he went for regular treatment, primarily massage therapy, for approximately one year after the accident. Yanez stopped this treatment because "..he told me I was all right", and also because "I felt all right." (Pl. Dep. at 83.) It also appears that he made a visit to a union doctor for back pain. (*Id.* at 82.) However, in his August 1998 affidavit, Yanez adds that he was treated at Roosevelt Hospital in October 1997 when his back gave out at work. This visit was not mentioned in his previous filings, or mentioned in his deposition testimony. Additionally, eight months after the accident, Yanez began to suffer jaw pain, which he believes is related to the accident.

Yanez claims some limitations at work due to his injuries. Yanez is a restaurant worker, and claims that he cannot perform all of the tasks that are required of the job. He now claims that he requires a support belt to do his job. However, Yanez admits that none of his employers or supervisors have complained about his work abilities since the accident.

1. *Evidence of Injury*

On the motion for summary judgment, defendants have offered all of the plaintiff's own medical records and evidence, along with an affidavit by Dr. Edward S. Crane, an orthopedic surgeon retained by the defendants. In opposition to the motion, and to support his contention that his injuries were serious as defined in the "no-fault" laws, Yanez offers the same medical records, along with the affidavit of his expert, Dr. R.C. Krishna, a neurologist. Yanez also offers his own affidavit.

Dr. Crane's analysis relies upon the medical records submitted by plaintiff and was written without the benefit of an examination of Yanez. Contrary to the assertions of plaintiff, Dr. Crane's affidavit is not merely a

restatement of defendant's legal position. Crane examined plaintiff's medical records, and addresses those injuries which he has expertise in, namely the back and shoulder injuries. From his review, he provides a reasonable conclusion: that the plaintiff's injuries were, at most, mild muscle strain and minor whiplash. Any further finding by Dr. Crane, absent an examination of plaintiff, would lack credibility.

Plaintiff's critique of Dr. Crane's declaration is rather hypocritical in light of the information provided by Dr. Krishna. Plaintiff, in their response to this motion, noted that Dr. Crane never examined Yanez, and claimed that Dr. Crane's affidavit was "tailored to defendant's legal arguments." Dr. Krishna's affidavit, which post-dated Dr. Crane's and plaintiff's own critique of defendant's expert, was far less informative.

Dr. Krishna, plaintiff's own expert, also did not examine Yanez. Dr. Krishna's declaration is merely a recitation of medical facts in this case, which are easily found in the records submitted by the litigants. Dr. Krishna's affidavit made no analysis, arrived at no new conclusions, and provided no enlightening commentary concerning Yanez's past or present physical condition. These conclusions merely include a finding of injuries consistent with whiplash, and muscular strain. These conclusions are no different than what the Court could glean from the other medical records, and in fact, they are similar to the findings of Dr. Crane. Thus, I find that the Krishna affidavit has almost no value in establishing Yanez's physical condition, and have decided the serious injury issue accordingly.

2. *Are Plaintiff's Injuries Permanent?*

One way in which a plaintiff can establish a prima facie case of serious injury, as defined by Section 5102(d) is to demonstrate that there is some permanence to his injuries. In this case, defendant has argued that Yanez's injuries were not permanent. Dr. Crane found that Yanez merely suffered from a minor muscle strain for the three months following the accident. Plaintiff however, has no serious rebuttal to defendant's challenge on this ground, precluding a finding of

serious injury based upon permanent loss of a body function or system.

 Dr. Krishna's affidavit, already of questionable value, does not state that plaintiff's injuries were permanent, and therefore does not lend support to the serious injury claim in this regard. *See, Washington v. Mercy Home for Children,* 232 A.D.2d 549, 648 N.Y.S.2d 956 (2d Dept.1996)(affirming denial of summary judgment where doctor had examined patient, quantified patient's limitations and asserted that these limitations were permanent). The medical records submitted by the plaintiff do not demonstrate that his injuries have caused a permanent loss of bodily function or system. Nowhere in the chiropractic or MRI reports, which are approximately 5 years old, are Yanez's physical problems described as permanent. The 1994 report of Dr. Richter, who treated plaintiff for jaw problems, indicates that the prognosis is guarded, but treatable, and does not demonstrate a permanent loss. The only remaining possibility for proof on this point is Yanez's own testimony. However, since plaintiff can only provide subjective descriptions of pain, and not competent medical testimony concerning the permanency of his alleged loss, his testimony cannot help establish serious injury in this regard. *See, Daviero v. Johnson,* 110 Misc.2d 381, 385, 441 N.Y.S.2d 895, 898 (Sup.Ct.1981)(holding that plaintiff's statement of pain alone was not sufficient to support a finding of permanency, absent medical testimony, where the injuries in question are subjective in nature). Thus, plaintiff has not established a serious injury, as defined in Section 5102(d), based upon "permanent consequential limitation of a use of a body organ or member."

3. *Serious Injury Due to Significant Limitation of Use of A Body Function or System*

In their response to the instant motion, defendants claim that Yanez has not sustained a significant limitation of use of a body function or system. As stated *infra,* Dr. Crane's analysis of Yanez's medical records indicate that Yanez suffered mild muscle strain and whiplash for the three months following his injury.

■ Setting Dr. Krishna's affidavit aside, this Court is left with medical records and Yanez's own testimony to establish that Yanez has some significant limitation, as defined under New York's "no-fault" law. Plaintiff's medical records reflect findings of limitation in motion in plaintiff's back and shoulder. A review of the records themselves, absent any proper interpretation by plaintiff's expert, does not indicate substantial limitation in Yanez's bodily functions. All of the ·objective measurements made of Yanez's skeletal and muscle systems, along with the relevant MRI images, were taken in late 1993, almost five years ago and raise no triable issues of fact. *See, Covington v. Cinnirella*, 146 A.D.2d 565, 536 N.Y.S.2d 514 (2d Dept.1989).

Additionally, Yanez ceased regular treatment, which merely consisted of massage therapy, approximately one year after the accident, because as he stated, "I felt all right." An assessment of significance entails examining not just the degree or extent of the limitation but its duration as well. *McCleary v. Hefter*, 194 A.D.2d 594, 599 N.Y.S.2d 81 (2d Dept.1993). These objective facts hardly support a finding of significant limitations with regards to his back and shoulder problems.

The dental complaints of Yanez suffer a similar fate. While the report of June 1994, eight months after the accident, claims that there is a causal relationship between Yanez's complaints and the accident with Thompson, there is no statement in that report indicating that the dental problems are objectively a significant limitation on Yanez's regular functions. Also, this evaluation, like the chiropractor and MRI reports, was performed over four years ago. Without followup, an evaluation of the success of the recommended treatment or any current data, its relevance to the current motion is negligible. *Id.*

Finally, this Court is left with Yanez's description of his pain and suffering as his only evidence of a significant limitation on the use of a body organ, member or system. However, his descriptions are merely subjective impressions, and are not objective findings, as would be found by doctors or other medical professionals. A plaintiff's description of his pain and suffering, standing alone without other objective indica, cannot support a claim of significant limitation. *See, Scheer v. Koubek*, 70 N.Y.2d 678, 679, 518 N.Y.S.2d 788, 512 N.E.2d 309 (1987), and *Rhind v. Naylor*, 187 A.D.2d 498, 589 N.Y.S.2d 605 (2d Dept.1992). Thus, Yanez's deposition testimony does not support his claim of significant limitation under the "no-fault" law.

Therefore, Yanez's claim of significant impairment, supported by dated objective evidence, lacking detailed medical evidence concerning the duration or ongoing nature of the impairment, and only bolstered by plaintiff's subjective complaints, must fail under Section 5102(d). *See, e.g., Beckett v. Conte*, 176 A.D.2d 774, 575 N.Y.S.2d 102 (2d Dept. 1991). (Granting summary judgment where plaintiff's medical evidence was based on examinations performed two to three years prior, where there was insufficient evidence of residual disability and plaintiff testified to complaints of recurring pain.) The records submitted by the both parties, along with Yanez's testimony concerning his course of treatment and recovery regimen, support defendants' assertion that any injuries suffered by Yanez were merely mild muscle strain and mild whiplash of a short duration. *See, e.g., Philpotts v. Petrovic*, 160 A.D.2d 856, 554 N.Y.S.2d 289 (2d Dept.1990). (Granting summary judgment on a serious injury claim where plaintiffs' physician affidavit was based on a 2½ year old examination, absent any information from a recent medical exam, when plaintiffs' testimony indicated a prompt recovery.)

### 4. *Plaintiff's 90/180 Day Claim*

■ Yanez's remaining claim of serious injury falls under the 90/180 day rule in 5102(d). To succeed, Yanez must demonstrate that he was restricted in performing substantially all of the material acts which constitute his usual and customary activities for ninety out of the one hundred and eighty days following injury. N.Y. Insurance Law § 5102(d). However, using this criteria, Yanez falls woefully short of demonstrating a serious injury under New York law.

Typically, courts have looked to a plaintiff's employment status as an indicia of fulfilling the 90/180 day rule. *See, e.g., Licari*, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 441 N.E.2d 1088, *Daviero*, 110 Misc.2d 381, 441 N.Y.S.2d 895. In the instant case, Yanez testified that he was only absent from work for 4 days after the accident with Thompson.[7] However, Yanez claims that he was forced to go back to work, since he derives a significant portion of his income from tips. While I am sympathetic to the obstacles faced by Yanez, a restaurant worker who is dependent upon gratuities for a large part of his income, his situation does not merit an exception to the rule. Yanez's four day absence from work does not even approach the 90 days required by statute. In addition, I am not persuaded by the "necessity to work" argument because of points raised in Yanez's deposition testimony. At deposition, Yanez stated that his employers and supervisors have not complained about his post accident work performance. These statements do not support Yanez's argument that he could not fulfill the 90/180 day rule because he was forced to work with an impairment. On the contrary, it suggests that the injury did not seriously effect his ability to work.

Since Yanez has not demonstrated that his loss of body function is not permanent or significant, and he has not demonstrated an inability to perform his customary and usual activities under the 90/180 day rule, all claims of serious injury under N.Y. Insurance Law Section 5102(d) are dismissed.

## H. PLAINTIFF'S CLAIM OF ASSAULT AND BATTERY

■■■■ Under New York Law, an assault is the intentional placing of another in apprehension of harmful or offensive contact. *See e.g., United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir.1993). A battery is a wrongful physical contact with another through intentional contact by the tortfeasor and without the consent of the

victim. *Id.* An assault, unlike a battery, can be completed without actually touching the victim. *Id.*

■■■ In this case, even assuming that all of Yanez's contentions are true, there was no use of force by the officers. The complaint and Yanez's testimony, both at the criminal trial and deposition make no mention of the unreasonable contact, or the threat of unreasonable contact by any of the defendants. As such, all claims of assault and battery must be dismissed.

## *CONCLUSION*

In conclusion, summary judgment is granted to defendants Solt, Lewis and Hernandez for all claims of false imprisonment, false arrest, malicious prosecution and conspiracy. I have also found that Bogus, Lyons, Thompson and Morris do not have qualified immunity on the claims of false imprisonment, false arrest, malicious prosecution and conspiracy claims. With regard to defendant City of New York, I have granted summary judgment on all of plaintiff's *Monell* claims. Finally, summary judgment on all tort claims related to "serious injury" claims under New York Insurance Law § 5102(d) is granted.

**SO ORDERED.**

---

7. Although it was not a factor in my decision here, at least one New York court has concluded, without resorting to the 90/180 rule, that a quick return to employment establishes a prima facie case for no serious injury under 5102(d) *See, Attanasio v. Lashley*, 223 A.D.2d 614, 636

N.Y.S.2d 834 (2d Dept.1996) (holding that where a plaintiff returned to work eight days after her injury, and had no other absences due to the injury, the burden shifted to the plaintiff to demonstrate a triable issue of fact).