**Robert OTERO, Plaintiff(s),**

v.

**TOWN OF SOUTHAMPTON, Town of Southampton Police Department, and Police Officer Andrew Mazzio, Defendant(s).**

**No. 99–CV–5919 (TCP).**

United States District Court, E.D. New York.

March 28, 2002.

Jerry Garguilo, St. James, NY, for Plaintiff.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiff brought this action pursuant to the Civil Rights Act of 1870, 42 U.S.C. §§ 1981, 1983, *et seq.*, for violations of the Fourth, Fifth and Fourteenth Amendments as well as various State laws. (Compl.¶¶ 2, 20–30.)

Defendants Town of Southampton, Town of Southampton Police Department and Police Officer Andrew Mazzio (collectively the "Defendants") move this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed herein, Defendants' motion should be and the same is hereby granted.

### *BACKGROUND*

**I.** *Factual Background*

*Plaintiff's Employment and Health*

Plaintiff was employed as a school bus driver for the Montauk Bus Company.

Plaintiff stated that he has suffered from "bad balance" his entire life. (Dep. of Otero at 59–60; Examination of Otero at 28.)[1] Plaintiff has stated that he has never fallen because of said bad balance. (Dep. of Otero at 59.) However, Plaintiff has also stated that he "sometimes" can recover from losing his balance but "sometimes" falls down. (Examination of Otero at 29.)

*January 20, 1999 and January 21, 1999*

Plaintiff began to feel ill on the evening of Wednesday, January 20, 1999. (Dep. of Otero at 53). Plaintiff suffered from a headache and a cough. (Dep. of Otero at 53.) Plaintiff stated that he probably took Bayer aspirin (500 milligrams) and Robitussin before going to bed. (Dep. of Otero at 53.) Plaintiff was unable to sleep through the night and therefore got out of bed a few times. (Dep. of Otero at 54.)

Plaintiff stated that he felt "terrible" upon awaking on Thursday, January 21, 1999. (Dep. of Otero at 54.) Plaintiff suffered from a sore throat, cough, headache and aches. (Dep. of Otero at 54.) Plaintiff therefore called in sick to work at 6:00 am on January 21, 1999. (Dep. of Otero at 54.)

While at home on January 21, 1999, Plaintiff stayed in bed all day. (Dep. of Otero at 56.) Plaintiff did not telephone a doctor. (Dep. of Otero at 57.) He took two tablets of Bayer aspirin (500 milligrams) and Robitussin every four hours. (Dep. of Otero at 56–57.) He also took a high blood pressure medication which he takes daily. (Dep. of Otero at 57.) Plaintiff possibly consumed soup that day. (Dep. of Otero at 58.)

*January 22, 1999*

When Plaintiff's alarm clock sounded at 6:00 am on January 22, 1999, he "still felt very sick." (Dep. of Otero at 61.) Upon calling work to inform them that he was still sick, Plaintiff was told that he was needed to work that day and decided to "do them a favor and go in [ ] even though [he] was still sick". (Dep. of Otero at 62.)

Plaintiff did not eat breakfast before leaving the house on January 22, 1999. (Dep. of Otero at 63.) He took Robitussin and two tablets of Bayer aspirin (500 milligrams). (Dep. of Otero at 63.)

Plaintiff left his house at 6:30 am for his first route. (Dep. of Otero at 62.) His first route took about two (2) hours and fifteen (15) minutes, or slightly longer. (Dep. of Otero at 65.) He did not take any medication during his first route. (Dep. of Otero at 65.)

---

1. This memorandum distinguishes between the "deposition" of Plaintiff dated June 18, 1999 and the "examination" of Plaintiff dated May 8, 2001.

Upon completing his first route of the day, Plaintiff returned to his house for about four and one half (4½) hours during which time he was "lying down until the next run." (Dep. of Otero at 65–66.) He took Robitussin and Bayer aspirin (500 milligrams) four hours after his morning dosage. (Dep. of Otero at 66.) He also ate toast and drank tea. (Dep. of Otero at 67.)

Plaintiff began his second route at approximately 1:50 pm. (Dep. of Otero at 67.) He stated that the children on the bus knew that he was sick based on how he looked, namely he "didn't look good" and "looked tired". (Dep. of Otero at 70.) During his second route, he ate Halls cough drops. (Dep. of Otero at 70–71.) He did not take any other medication during his second route. (Dep. of Otero at 71.)

Upon completing his second route of the day, Plaintiff returned to his house at about 4:30 pm. (Dep. of Otero at 70.) He had some coffee but could not drink it because "it didn't taste right." (Dep. of Otero at 70.) He could not recall if he ate anything at this time. (Dep. of Otero at 70.). Plaintiff does recall taking Bayer aspirin and Robitussin at this time. (Dep. of Otero at 71.)

Plaintiff then began his third route and the events at issue ensued.

### Steven Mars

Sometime between 5:30 and 6:00 pm on January 22, 1999, Steven Mars ("Mars") was driving eastbound on Sunrise Highway. (Dep. of Mars at 38; Statement of Steven R. Mars of 3/08/99, at 1.) Mars was passed by a mid-sized school bus traveling eastbound in the left passing lane. (Statement of Steven R. Mars of 3/08/99, at 1.) As the bus passed Mars' car, the bus moved toward Mars' lane such that Mars was caused to "move slightly over the white shoulder marking line." (Statement of Steven R. Mars of 3/08/99, at 1.) Mars slowed down, let the bus pass and continued to follow the bus eastbound as the traffic went to a single lane. (Statement of Steven R. Mars of 3/08/99, at 1.) He noticed that "the bus was swerving from side to side in his lane and at least once crossed over the white line to the shoulder." (Statement of Steven R. Mars of 3/08/99, at 1.) He continued to follow the bus and noticed that the bus continued to swerve within his lane and cross into the shoulder, all the while traveling at least sixty five miles per hour (65 mph). (Statement of Steven R. Mars of 3/08/99, at 1.)

After following the bus for a period of time, Mars was concerned enough to call "911". (Statement of Steven R. Mars of 3/08/99, at 1.) He told the dispatcher that he was following a bus driver who he suspected to be drunk. (Statement of Steven R. Mars of 3/08/99, at 1.) Mars then lost his cellular phone signal. (Statement of Steven R. Mars of 3/08/99, at 1.)

Mars then observed "the bus swerve[ ] over the double yellow line well into the safety zone." (Statement of Steven R. Mars of 3/08/99, at 1.) He continued to follow the bus, and the bus continued to swerve in the lane and occasionally "cross[ ] onto the shoulder and over the double yellow line." (Statement of Steven R. Mars of 3/08/99, at 1.)

Mars continued to follow the bus because it was, in his opinion, "an accident waiting to happen." (Statement of Steven R. Mars of 3/08/99, at 1–2.)

Mars then spotted Police Officer Mazzio, who was parked in the North Sea Fire Department parking lot. (Statement of Steven R. Mars of 3/08/99, at 2; Dep. of Mars at 47.) He approached Police Officer Mazzio and informed him that he believed that the school bus driver might be intoxicated because "his driving is impaired; he's all over the road." (Dep. of Mars at 48.)

Police Officer Mazzio then pursued the bus and Mars dialed the non-emergency number to report what he had observed concerning the school bus. (Dep. of Mars at 49; Statement of Steven R. Mars of 3/08/99, at 2.)

By the time Steven Mars began driving again and caught up with Police Officer Mazzio, Plaintiff had already been placed in the police vehicle. (Statement of Steven R. Mars of 3/08/99, at 2; Dep. of Mars at 51–52.) Mars reported that when he asked Police Officer Mazzio "[w]as the guy intoxicated", Police Officer Mazzio responded "I thought so." (Dep. of Mars at 52.)

### Police Officer Mazzio

Upon speaking to Mars at approximately 6:00 pm, Police Officer Mazzio pursued Plaintiff's bus traveling northbound on North Sea Road. (Mazzio Aff. ¶ 1; Police Report of 1/22/99.) Police Officer Mazzio followed the bus for approximately one and a half (1½) miles and observed Plaintiff's bus cross over the double yellow line and travel all the way across the southbound lane to the curb. (Mazzio Aff. ¶ 2; Police Report of 1/22/99.) Police Officer Mazzio then observed the bus abruptly return to the northbound lane and cross into the shoulder. (Mazzio Aff. ¶ 2; Police Report of 1/22/99.) Thereafter, Police Officer Mazzio observed the bus turn right onto Noyac Road, at which time the bus drove onto the right shoulder and into the curb. (Mazzio Aff. ¶ 2; Police Report of 1/22/99.) He also observed the bus move into the oncoming lane of traffic when making the turn.[2] (Mazzio Aff. ¶ 2; Police Report of 1/22/99.)

Police Officer Mazzio activated the siren lights on his marked police car. (Mazzio Aff. ¶ 3; Police Report of 1/22/99.) He stated that Plaintiff did not heed to the signal for approximately one quarter (1/4) of a mile. (Mazzio Aff. ¶ 4; Police Report of 1/22/99.) The bus then stopped at the intersection of Noyac Road and Straight Path Road, North Sea. (Mazzio Aff. ¶ 4; Police Report of 1/22/99.)

Police Officer Mazzio approached the driver's side of the bus. (Police Report of 1/22/99.) After about a one (1) minute conversation, Police Officer Mazzio determined that Plaintiff was "highly intoxicated." (Police Report of 1/22/99.) He asked Plaintiff to exit and walk to the rear of the bus. (Police Report of 1/22/99; Mazzio Aff. ¶ 6.)

Police Officer Mazzio stated that Plaintiff "fell" to the ground upon descending from the bus, specifically that "[h]e opened the door and went to step out and just fell down." (Dep. of Mazzio at 63.) He observed that Plaintiff "had great difficulty walking and standing" and had a "blank stare, slurred and labored speech." (Mazzio Aff. ¶ 6.)

Police Officer Mazzio stated that, in his professional opinion at the time, Plaintiff was "very impaired." (Dep. of Mazzio at 63.) He did not, at that time, form an opinion as to what was the cause of impairment. (Dep. of Mazzio at 63.)

Police Officer Mazzio did not perform a breath test at the scene because he did not suspect alcohol impairment. (Dep. of Mazzio at 85.) He stated that he "had no idea" what was impairing Plaintiff. (Dep. of Mazzio at 85.)

Police Officer Mazzio reported that he did not perform any standard field sobriety tests at the scene because Plaintiff was "so unsteady a-foot he couldn't stand to

---

**2.** Plaintiff contends that, while on Noyac Road, "some of [his] tire might have went over the line on the turn." (Dep. of Otero at 100.) Plaintiff stated that his driver's side tire went over the line into the other lane of traffic for a short time but he then "turned the bus back." (Dep. of Otero at 100–01.)

perform the same." (Police Report of 1/22/99.)

Police Officer Mazzio submits that during the course of the processing of Plaintiff's arrest, "Plaintiff stated that he had taken too much 'Robitussin' for his cold." (Mazzio Aff. ¶ 11.) Police Officer Mazzio believed that "cold medicine, such as 'Robitussin', contains a quantity of alcohol." (Mazzio Aff. ¶ 11.)

Based on Police Officer Mazzio's report from Mars, his own observations of Plaintiff's driving, his own observations of Plaintiff's physical condition and demeanor and his experiences and training concerning Driving While Intoxicated ("DWI"), Police Officer Mazzio determined that he had probable cause to arrest Plaintiff for DWI. (Mazzio Aff. ¶ 7.)

Police Officer Mazzio placed Plaintiff in the police car and then observed a child seated in the bus. (Police Report of 1/22/99.) He also observed that the child had Down Syndrome, could not speak, appeared somewhat nervous, and was not wearing a seatbelt. (Police Report of 1/22/99.) Based on his observation of "an un-seatbelted disabled child [occupying] the school bus at the time of its dangerous operation by Plaintiff", Police Officer Mazzio decided to charge Plaintiff with Endangering the Welfare of a Child. (Mazzio Aff. ¶ 8.)

Plaintiff was, in fact, charged with Endangering the Welfare of a Child in addition to DWI.[3] (Mazzio Aff. ¶ 12.)

### Handcuffs

In effecting Plaintiff's arrest, Police Officer Mazzio used handcuffs pursuant to Southampton Police Department procedure. (Mazzio Aff. ¶ 26.) Specifically, he placed handcuffs on Plaintiff and then led him to the police car. (Dep. of Otero at 125.) Plaintiff stated that Police Officer Mazzio pulled on the handcuffs once. (Dep. of Otero at 125.) He did not complain to Police Officer Mazzio that the handcuffs were uncomfortable. (Mazzio Aff. ¶ 26; Examination of Otero at 56–57.) The handcuffs did not leave any mark on Plaintiff's wrist, nor make Plaintiff's wrists bleed. (Dep. of Otero at 125; Examination of Otero at 56.) Plaintiff did not request to see a doctor concerning his wrists while at the Southampton police headquarters or any time thereafter. (Examination of Otero at 55–56.) Police Officer Mazzio stated that he did not use any force, and certainly not "excessive force", in arresting Plaintiff. (Mazzio Aff. ¶ 26.)

### Sobriety Tests at Police Headquarters

At police headquarters, Plaintiff underwent standard field sobriety tests. (Mazzio Aff. ¶ 9; Police Report of 1/22/99; Dep. of Otero at 131.) For the first test of standing on one foot, Police Officer Mazzio testified that Plaintiff could not do so for any amount of time without falling over.[4] (Mazzio Aff. ¶ 10.) For the second test of a line walk, in which Plaintiff was instructed to walk nine (9) steps heel-to-toe back and forth without raising his arms, Police Officer Mazzio stated that Plaintiff walked eleven (11) steps out and four (4) steps back, all the while waving his arms.[5] (Mazzio Aff. ¶ 10.) For the third test, in which Plaintiff was asked to close his eyes and estimate thirty (30) seconds, Plaintiff estimated nineteen (19) seconds to be thirty (30) seconds. (Mazzio Aff. ¶ 10.) For the fourth test, gaze-nestagmus, Plaintiff was asked to keep his head still and follow

---

3. *See* discussion *infra* Section "Arrest and Traffic Violations".

4. Plaintiff admits that he was not able to perform this test. (Dep. of Otero at 131.)

5. Plaintiff stated that he thinks he was able to perform this line walk test. (Dep. of Otero at 132.)

a moving pen with his eyes but was unable to do so.[6] (Mazzio Aff. ¶ 10.)

Sergeant Tanzi, of the Southampton Police Department, observed Plaintiff at police headquarters on January 22, 1999. (Dep of Tanzi at 108.) Sergeant Tanzi stated that Plaintiff had a "thick" and "slurred" speech and looked very "straight faced." (Dep. of Tanzi at 108.) Sergeant Tanzi further observed that when Plaintiff had his hands together on the end of a table, his hands "kept falling down." (Dep. of Tanzi at 108–09.)

### Blood Test

Plaintiff submitted to having his blood drawn and tested. (Mazzio Aff. ¶ 12.) Plaintiff's blood was transported to the Suffolk County Toxicology Lab. (Mazzio Aff. ¶ 14.) Toxicologic Reports from the Division of Medical–Legal Investigations and Forensic Sciences, County of Suffolk, New York, dated between February 2, 1999 and February 8, 1999, reported "ethanol not detected" and "drugs not detected" in Plaintiff's blood. (Garguilo Aff.Exs. 2–6.)

### Arrest and Traffic Violations

Police Officer Mazzio believed that, based on the totality of the circumstances, he had the requisite probable cause to arrest Plaintiff for Driving While Intoxicated in violation of N.Y.VEH. & TRAF.LAW § 1192(3) (McKinney 1996) (hereinafter "Section 1192(3)") and Endangering the Welfare of a Child in violation of N.Y.PE-NAL LAW § 260.10(1) (McKinney 1996) (hereinafter "Section 260.10(1)"). (Mazzio Aff. ¶ 13.)[7] Plaintiff was also issued summonses for traffic violations. (See Clifford Aff.Ex. M.)

Section 1192(3) reads: "Driving while intoxicated. No person shall operate a motor vehicle while in an intoxicated condition." N.Y.VEH. & TRAF.LAW § 1192(3).

Section 260.10(1) provides that a person is guilty who "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his life or health." N.Y.PENAL LAW § 260.10(1).

Plaintiff contends, and his blood work confirms, that he was not driving under the influence of alcohol and/or prohibited drugs or controlled substances as defined in the Vehicle and Traffic Law of the State of New York on January 22, 1999. (Pl.'s 56.1(b) Stmt. ¶¶ 5–6.) Plaintiff further contends that he "was not 'intoxicated' as a matter of law." (Pl.'s 56.1(b) Stmt. ¶ 7.)

### Section 1192(3)

Police Officer Mazzio stated that he used Section 1192(3) because "it was the most appropriate charge under the circumstances." (Mazzio Supp.Aff. ¶ 2.) Section 1192(3) prohibits driving while in an "intoxicated condition." N.Y.VEH. & TRAF.LAW § 1192(3). Police Officer Mazzio believed that Plaintiff was in an "intoxicated condition, and as a result his ability to operate the school bus was impaired." (Mazzio Supp.Aff. ¶ 2.)

---

**6.** Plaintiff thinks that he was unable to perform several "pen tests" without moving his head. (Dep. of Otero at 133.)

**7.** Specifically, Police Officer Mazzio refers to Mars' eyewitness account; his observation of the operation of the bus; his observation of Plaintiff to be the operator of the bus; his observation of Plaintiff's inability to stand or walk without difficulty at the scene; his ob-servation of Plaintiff's physical appearance and demeanor at the scene; Plaintiff's inability to perform field sobriety tests; Plaintiff's admission of consuming "an excessive quantity of 'Robitussin'", his understanding that Robitussin contains a quantity of "alcohol and/or other intoxicants"; and his experience and training concerning DWI. (Mazzio Aff. ¶ 13.)

Police Officer Mazzio determined that section 1192(4), which charges "driving while ability impaired by drugs", was an inappropriate charge without the benefit of laboratory results at the arrest stage. (Mazzio Supp.Aff. ¶ 4.)

Police Officer Mazzio stated that, while at the scene and without the benefit of laboratory results, he was not certain what was impairing Plaintiff; however "it was clear that something was impairing his ability to drive, stand, walk and speak." (Mazzio Supp.Aff. ¶ 3.)

Police Officer Mazzio did state that he did not suspect alcohol impairment and therefore did not perform a breath test at the time of arrest. (Dep. of Mazzio at 85.) He said further that he did not smell alcohol on Plaintiff's breath nor anywhere in the vehicle; nor did he uncover any alcohol or drugs or medication in the school bus. (Dep. of Mazzio at 66–67.) However, Police Officer Mazzio stated that, during the course of the arrest, Plaintiff stated that he had consumed "too much 'Robitussin' for his cold", and that he believed Robitussin to contain "a quantity of alcohol." (Mazzio Aff. ¶ 11.)

At headquarters, Police Officer Mazzio told Sergeant Tanzi that he did not suspect that Plaintiff was under the influence of alcohol when stopped. (Dep. of Mazzio at 91.)

Sergeant Drinkwater stated that it was appropriate for Police Officer Mazzio to use Section 1192(3) given that he did not "know what kind of cold medicine this guy was taking [and][h]e just said he had taken too much cold medication." (Dep. of Drinkwater at 24.) Sergeant Drinkwater further stated that, "[i]f you charge 1192(3) and the person submits to a blood test, which would be normal policy in a felony DWI case, you can always ask the lab to examine for a variety of substances,

alcohol and/or other substances and you can file an amended information later and you're basing it upon your observations or your belief that the person is intoxicated based upon the way they're acting." (Dep. of Drinkwater at 24.)

Similarly, Sergeant Tanzi stated that it would be appropriate to charge the driver with Section 1192(3) if an officer is uncertain what was impairing a driver because the court information could later be amended following the lab results. (Dep. of Tanzi at 110–11.)

### Press Release and Newsday Article

On January 22, 1999, Sergeant Drinkwater,[8] of the Southampton Police Department, prepared a press release regarding Plaintiff's arrest. (Dep. of Drinkwater at 7–8.) Sergeant Drinkwater spoke to Police Officer Mazzio and possibly Sergeant Tanzi in preparing the press release. (Dep. of Drinkwater at 8.) As Police Officer Mazzio was still processing the paperwork, Sergeant Drinkwater prepared the press release "based upon what [he] knew about the situation." (Dep. of Drinkwater at 9.) Sergeant Drinkwater noted that information about arrests is released to the media in "an effort to reduce all the questioning that would happen later on once the media got a hold of the arrest report." (Dep. of Drinkwater at 9.)

Sergeant Drinkwater's prepared statement, dated January 22, 1999, summarized the events at issue. (Interoffice Memorandum of 1/22/99.) The statement indicated, in part, that "Officer Mazzio interviewed Mr. Otero at the scene and developed probable cause that Mr. Otero's ability to drive was impaired by drugs" and that Plaintiff was arrested and subsequently charged with "One count of Driving While Ability Impaired by Drugs, a Class E Felony" and "One count of Endangering the

---

**8.** Sergeant Drinkwater is not a named defendant in this action.

Welfare of Child a Class A Misdemeanor." (Interoffice Memorandum of 1/22/99.) This statement was partly inaccurate as Plaintiff was never charged with driving while impaired by drugs. (Pl.56.1(b) Stmt. ¶ 18.)

On or about January 23, 1999, Long Island Newsday ran an article on Plaintiff's arrest. (Pl.s 56.1(b) Stmt. ¶ 16; Garguilo Aff.Ex. 8.) The article stated, in part, that Plaintiff was arrested for allegedly driving while impaired by drugs and endangering the welfare of a child. (Garguilo Aff.Ex. 8.)

### Alleged "Perp Walk"

On the morning of January 23, 1999, Plaintiff was taken to court to be arraigned. (Dep. of Otero at 138; Pl.'s 56.1(b) Stmt. ¶ 11.). A local news station filmed and broadcast the same. (Clifford Aff.Ex. S.) As Plaintiff was filmed walking to the car, neither Plaintiff's handcuffs nor a uniformed police officer was visible. (Clifford Aff.Ex. S.) However, upon viewing the video tape, this Court notes that one could reasonably deduce that Plaintiff was handcuffed based upon how he held his hands behind his back. (Clifford Aff.Ex. S.)

A Southampton Police Department General Order dictated that certain information should be not released without clearance from the Chief of Police, information which included "[posing] an arrestee for news representatives to video tape or take still pictures of him/her." (Southampton Town Police Department General Order 26–97, Public Information/Community Relations, dated September 29, 1997 at § 4.9.10.)

### Arraignment and Imprisonment

Plaintiff was arraigned on January 23, 1999. (Pl.'s 56.1(b) Stmt. ¶ 11.) Plaintiff was unable to post the set bail and remained incarcerated until February 5, 1999. (Pl.'s 56.1(b) Stmt. ¶¶ 12–13.)

### Criminal Charges Dismissed

At a February 5, 1999 court appearance in the County of Suffolk Justice Court, Town of Southampton, the People moved to dismiss the Driving While Intoxicated charge as a result of Plaintiff's blood results returning negative. (Tr. of 2/5/99 at 2.) The presiding judge also dismissed the charge of Endangering the Welfare of a Child. (Tr. of 2/5/99 at 6.)

### Reckless Driving Charge

On March 9, 1999, Police Officer Mazzio was asked to sign a Misdemeanor Traffic Information charging Plaintiff with Reckless Driving, a charge stemming from the events of January 22, 1999.[9] (Misdemeanor Traffic Information of 3/9/99; Pl.'s 56.1(b) Stmt. ¶ 21; Mazzio Aff. ¶ 20.)

Police Officer Mazzio stated that neither he nor, to his knowledge, anyone in his department, initiated bringing the Reckless Driving charge against Plaintiff. (Mazzio Aff. ¶ 20.) Instead, Police Officer Mazzio understood that the decision was made by the Suffolk County District Attorney's Office. (Mazzio Aff. ¶ 20.) Sergeant Tanzi likewise would assume that the District Attorney's office lodged the Reckless Driving charge. (Dep. of Tanzi at 66.)

Plaintiff contends that it was unusual for the police to issue additional charges stemming from an incident after the original charges had been dismissed. (Pl.'s 56.1(b) Stmt. ¶¶ 24–26; Dep. of Mazzio at 111; Dep. of Overton at 89–90; Dep. of Drinkwater at 65.) Plaintiff also contends that Southampton Police Department General Order 46–97 would dictate that Reckless

---

**9.** "A person is guilty of Reckless Driving when he drives of [sic] uses any motor vehicle, motorcycle or any other vehicle propelled by any power other than muscular power or any appliance or accessory thereof in a manner which unreasonably endangers users of the public highway." (Misdemeanor Traffic Information of 3/9/99.)

Driving should have been charged, if at all, on the date of the original arrest. (Pl.'s 56.1(b) Stmt. ¶ 32.)

### Failure to Maintain Lane

On June 14, 1999, in the Southampton Town Justice Court, Suffolk County, the People made an application to amend the Reckless Driving charge to instead cite a violation of VTL § 1128(a), Failure to Maintain Lane, "contingent upon [Plaintiff] withdrawing his previously entered plea of not guilty and entering a plea of guilty to the reduced charge[ ]." (Tr. of 6/14/99 at 5.) Plaintiff pled guilty to VTL § 1128(a) and admitted that he crossed over the center markings one time. (Tr. of 6/14/99 at 4, 5.) Plaintiff was fined $200 plus a $30 surcharge. (Tr. of 6/14/99 at 5.)

### Southampton Police Department Procedure and Training

Lieutenant Robert Iberger ("Iberger"), of the Southampton Police Department, stated that Police Officer Mazzio received in depth training for effecting DWI arrests and had recently received a refresher course concerning field sobriety tests and DWI arrests which included recognizing intoxication and impairment. (Iberger Aff. ¶¶ 2, 5, 7–15.) Further, Iberger stated that police officers receive extensive training on the use of handcuffs. (Iberger Aff. ¶ 5.)

### Police Officer Mazzio's Disciplinary History

Police Officer Mazzio previously worked for the City of Daytona Beach Police Department, but was dismissed for failure to report that a fellow officer had possessed marijuana. (Pl.'s 56.1(b) Stmt. ¶ 33; Dep. of Mazzio at 10.)

Further, Police Officer Mazzio was once terminated from the Southampton Police Department for failure to report to full duty while on disability status although physically able to do so, and was later reinstated with full benefits. (Pl.'s 56.1(b) Stmt. ¶¶ 36–40; Dep. of Mazzio at 42.)

## II. Procedural Background

### Notice of Claim and Complaint

Plaintiff served a Notice of Claim and then filed a Summons and Complaint in this Court on or about September 24, 1999.

This action arises under the Civil Rights Act of 1870, Title 42 United States Code §§ 1981, 1983, et seq. for alleged violations of the Fourth, Fifth, and Fourteenth Amendments and various state laws.[10] (Compl.¶¶ 2.)

### Motion For Summary Judgment

Defendants moved for Summary Judgment and this Court heard oral argument on December 7, 2001.

### SUMMARY JUDGMENT STANDARD

A court may grant summary judgment if it appears that "there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the record in a light most favorable to the non-moving party. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must show

---

**10.** The Complaint alleges State law claims of False Arrest, False Imprisonment, Malicious Prosecution, Negligence and Gross Negligence. (Compl.¶ 25.) The Joint Pre–Trial Order also indicates that Plaintiff asserts a Defamation claim. (Joint Pre–Trial Order at 3.)

that a disputed material fact exists in light of the substantive law by offering "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Dister*, 859 F.2d at 1114 (citations omitted).

## DISCUSSION

### I. Summary Judgment is Granted As To Plaintiff's 42 U.S.C. § 1983 Claims (False Arrest, False Imprisonment, Malicious Prosecution) Because Probable Cause Existed To Arrest And Charge Plaintiff

■ Claims for false arrest, false imprisonment and malicious prosecution fail with a finding of probable cause to arrest and charge Plaintiff.[11] *Campbell v. Giuliani*, No. 99–CV–2603, 2001 WL 91615, 2001 U.S.Dist. LEXIS 609, at *16 (E.D.N.Y. Jan. 24, 2001).

■ "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Curley v. Village of Suffern*, 268 F.3d 65, 69–70 (2d Cir.2001) (citations omitted); *see also Lowth*, 82 F.3d at 569; *Cooperstein v. Procida*, 2001 WL 715831, at *3 (E.D.N.Y. June 4, 2001). Further, "once a police officer has a reasonable basis for believing there is proba-ble cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Curley*, 268 F.3d at 70 (citations omitted). Nevertheless, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause" and thus there would be no probable cause to charge. *Lowth*, 82 F.3d at 571 (citations omitted).

■ At issue here is whether Police Officer Mazzio had probable cause to arrest and charge Plaintiff with Driving While Intoxicated in violation of Section 1192(3) and Endangering the Welfare of a Child in violation of Section 260.10(1).[12]

Here, the record reflects that an eyewitness, Steven Mars, observed Plaintiff's erratic driving and was concerned enough to call "911", follow Plaintiff and notify Police Officer Mazzio. In addition, the record reflects that Police Officer Mazzio personally witnessed Plaintiff cross over the middle line all the way over to the opposite shoulder and then make a wide turn and travel into oncoming traffic, all the while with one child passenger in the bus. Police Officer Mazzio testified that Plaintiff fell when descending from the bus, slurred his speech and was unsteady afoot. Plaintiff failed four standard sobriety tests at

---

11. To prove a claim of false arrest, a plaintiff must show that "1) the officer intended to confine the plaintiff; 2) the plaintiff was conscious of the confinement and did not consent to it; and 3) the confinement was not otherwise privileged ... that is, whether he had probable cause to arrest [ ]." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996). The elements of false imprisonment are essentially the same as those of false arrest. *Campbell v. Giuliani*, No. 99–CV–2603, 2001 WL 91615, 2001 U.S. Dist. LEXIS 609, at *8 n. 2 (E.D.N.Y. Jan. 24, 2001); *Yanez v. City of New York*, 29 F.Supp.2d 100, 106 (E.D.N.Y.1998). The elements of a claim for malicious prosecution are "1) that the defen-dant started a criminal proceeding against [plaintiff]; 2) that the proceeding terminated in the plaintiff's favor; 3) that there was no probable cause for the proceeding; and 4) that the proceeding was instituted with malice." *Lowth*, 82 F.3d at 571.

12. *See e.g. People v. Welch*, 289 A.D.2d 1021, 735 N.Y.S.2d 449 (2001); *People v. D'Augustio*, 272 A.D.2d 914, 708 N.Y.S.2d 777, 778 (2000); *People v. Farrell*, 89 A.D.2d 987, 454 N.Y.S.2d 306, 307 (1982); *Sorenson v. City of New York*, 2000 WL 1528282, at *10 (S.D.N.Y. Oct.16, 2000); *People v. Cruz*, 152 Misc.2d 436, 576 N.Y.S.2d 978, 981 (Crim.Ct.1991).

police headquarters. Further, Police Officer Mazzio testified that "Plaintiff stated that he had taken too much 'Robitussin' for his cold" and that Police Officer Mazzio believed that "cold medicine, such as 'Robitussin', contains a quantity of alcohol." (Mazzio Aff. ¶ 11.)

Notwithstanding the fact that Police Officer Mazzio stated that he did not suspect that Plaintiff was necessarily impaired by alcohol, he knew that Plaintiff was impaired by something. (Dep. of Mazzio at 85.) Further, Police Officer Mazzio knew that Plaintiff consumed Robitussin, a medication that Police Officer Mazzio suspected to contain a quantity of alcohol. (Mazzio Aff. ¶ 11.)

■ As an initial matter, this Court hesitates to conclude that Section 1192(3) pertains only to alcohol. Section 1192(3) does not mention alcohol, but rather refers to an "intoxicated condition." Further, this Court referred to the dictionary for guidance in this respect. The various definitions of the words intoxicated, intoxicant, intoxicate and intoxication support this Court's belief that intoxication is not limited to alcohol consumption. *See* OXFORD ENGLISH DICTIONARY (2d ed.1989).

That being said, this Court acknowledges that some New York cases support Plaintiff's contention that Section 1192(3) pertains only to alcohol. *See e.g. People v. Cruz,* 48 N.Y.2d 419, 423 N.Y.S.2d 625, 399 N.E.2d 513, 517 (1979) (stating that "intoxication is a greater degree of impairment which is reached when the driver has voluntarily consumed alcohol to the extent that he is incapable of employing the physical and mental abilities which he is expected to possess in order to operate a vehicle as a reasonable and prudent driver"); *People v. Farmer,* 36 N.Y.2d 386, 369 N.Y.S.2d 44, 330 N.E.2d 22, 22–23 (1975) (stating that the subdivisions of Section 1192 "proscribe separable offenses based upon the degree of impairment caused by alcohol

ingestion"); *People v. Bayer,* 132 A.D.2d 920, 518 N.Y.S.2d 475 (1987) (finding that, as a matter of law, 1192(3) "is intended to apply only to intoxication caused by alcohol"). However, it must be noted that, in none of these cases was the precise issue presented and decided as to whether the statute covered intoxication from a substance other than alcohol. Subdivision three (3), unlike one (1), two (2) and four (4), does not specify the cause of intoxication.

Even accepting the interpretation of Section 1192(3) as involving only alcohol, Police Officer Mazzio did not, and could not, conclusively rule out alcohol consumption without the benefit of laboratory tests. Plaintiff informed Police Officer Mazzio that he had consumed Robitussin, a medicine that Police Officer Mazzio believed to contain some quantity of alcohol. Police Officer Mazzio did not perform field sobriety tests at the scene of the arrest because he found Plaintiff unsteady afoot. Later, Plaintiff failed sobriety tests at the police station. Further, Police Officer Mazzio's fellow officers stated that, given the circumstances, Section 1192(3) was the proper charge and that the information could later be amended upon receipt of lab results. (Dep. of Drinkwater at 24; Dep. of Tanzi at 110–11.)

It is this Court's opinion that there existed probable cause to arrest and charge Plaintiff as Defendants did. It is not significant that Plaintiff's blood tests returned negative for alcohol and drugs. At issue is whether there was probable cause to arrest and charge Plaintiff with the crimes, not whether there was an actual violation of the same.

Based upon this Court's finding of probable cause to arrest and charge Plaintiff, the 42 U.S.C. § 1983 claims based upon false arrest, false imprisonment and mali-

cious prosecution against all Defendants must and do fail.

## II. *Plaintiff Failed To Establish His Claim Of Excessive Force*

■■■■ Excessive force claims arising out of an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To determine if the use of force in effecting an arrest is reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (citations omitted). Further, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

■■■ It is important to note that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id* (citations omitted). Indeed, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

■■■ Courts consider the injuries sustained, if any, as relevant to determining the "reasonableness" of the force applied. *See e.g. Gonzalez v. City of New York*, No. 98–CV–3084, 2000 WL 516682, 2000 U.S. Dist. LEXIS 5230, at *12 (E.D.N.Y. March 7, 2000) ("If a plaintiff sustains an injury during an arrest, this is a relevant factor for the court in considering whether the force used was reasonable.") "However, reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury." *Id.*

■■■ The use of handcuffs in an arrest situation is not *per se* reasonable. *Soares v. State of Conn.*, 8 F.3d 917, 921 (2d Cir.1993). However, the Second Circuit has noted that "handcuffing will be the reasonable course in many, if not most arrest situations ." *Id.* Further, courts have found that the use of handcuffing may give rise to a an excessive force claim where the plaintiff sustains injury; "[h]owever if the application of handcuffs was merely uncomfortableor caused pain, that is generally insufficient to constitute excessive force." *Gonzalez*, 2000 WL 516682, 2000 U.S. Dist. LEXIS 5230, at *12.

■■■ Here, Plaintiff's excessive force claim is based upon Police Officer Mazzio's use of handcuffs in effecting the arrest. Plaintiff's claim rests on his contention that Police Officer Mazzio pulled at the handcuffs one time. (Dep. of Otero at 125.) Plaintiff never complained that the handcuffs were uncomfortable. (Mazzio Aff. ¶ 26; Examination of Otero at 56–57.) The single pull did not leave a mark on Plaintiff's wrist, nor make Plaintiff's wrists bleed. (Dep. of Otero at 125; Examination of Otero at 56.) Plaintiff did not request to see a doctor concerning his wrists while in police custody or any time thereafter. (Examination of Otero at 55–56.)

Further, Southampton Police Department policy calls for the use of handcuffs in effecting arrests such as that of Plaintiff. Under the circumstances, it was reasonable to use handcuffs, and Police Officer's Mazzio use thereof was likewise reasonable.

Plaintiff has not provided sufficient evidence with which to sustain his excessive force claim, and summary judgment is granted in favor of Defendants with regard to the same.

### III. *The Alleged "Perp Walk" Did Not Violate The Fourth Amendment*

The Second Circuit has held that staged perp walks violate the Fourth Amendment. *Lauro v. Charles*, 219 F.3d 202, 213 (2d Cir.2000). In so holding, the court limited its decision as not applying to "cases in which there is a legitimate law enforcement justification for transporting a suspect." *Id.*

In *Lauro*, a police officer was told that the media was interested in the case and that the plaintiff should be taken on a perp walk. *Id.* at 204. Accordingly, the officer handcuffed the plaintiff, walked him out the front door of the station, placed him in an unmarked police car, drove him around the block, removed him from the car and then walked him back into the station. *Id.* at 204–05. The perp walk was filmed and broadcast by Fox 5 News. *Id.* at 205. In *Lauro*, "the press and the public were not viewing the actual event of [plaintiff] being brought to the police station, but rather, were offered a staged recreation of that event." *Id.* at 213.

 In contrast, in the instant case, Plaintiff was being transported to his arraignment. (Dep. of Otero at 138; Pl.'s 56.1(b) Stmt. ¶ 11.) There was no staged recreation here. Further, Plaintiff was not escorted by a uniformed police officer, nor were handcuffs blatantly visible although one could assume that Plaintiff was handcuffed given that he held his hands behind his back. (Clifford Aff. Ex. S.) Also notable is the fact that an internal police department directive mandated that officers shall not "[p]ose an arrestee for news representatives to video tape or take still pictures of him/her" without first obtaining permission from the Chief of Police. (Southampton Town Police De-partment General Order 26–97, Public Information/Community Relations, dated September 29, 1997 at § 4.9.10.)

Transporting Plaintiff to his arraignment qualifies as a legitimate law enforcement purpose. There is no sufficient evidence that this was a staged "perp walk" in violation of the Fourth Amendment. Therefore, Defendants' motion for summary judgment on this ground is granted.[13]

### IV. *State Law Claims*

Given that this Court has dismissed all claims based upon federal law, this Court declines to exercise jurisdiction over the remaining State law claims. *See e.g. United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Campbell*, 2001 WL 91615, 2001 U.S. Dist. LEXIS 609, at *18.

### CONCLUSION

Accordingly, for the foregoing reasons, Defendants' motion for summary judgment should be and the same is hereby granted.

SO ORDERED.

---

**13.** Had this Court found that the perp walk was staged, Police Officer Mazzio nonetheless would have enjoyed qualified immunity from said claim because the unconstitutionality of staged perp walks was not "clearly established" until *Lauro* was decided on July 28, 2000. 219 F.3d at 216.