Robert James WATKINS, Plaintiff,

v.

CITY OF HIGHLAND PARK, Police Chief Ronald Parham, Sr., Deputy Police Chief Theodore Cadwell, II, Lt. Love, Sgt. Robert Howard, Sgt. Rose Logan, Sgt. Glenn Quaker, CPL. John Bennett, CPL. Abron Carter, CPL. Douglas Potts, CPL. Brenda Stevenson, Officer Jamey Abney, Officer David Bragg, Officer Veronica Corbin, Officer Robert Fruit, Officer Derek Harris, Officer Eric Hollowell, Officer Stuart Jackson, Officer Craig Natt, Officer Colon Trombetta, and Officer Nichalos Viviano, Defendants.

No. 00–74859.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 19, 2002.

Paul Broschay, Esq., Feiger, Fieger, Southfield, MI, for Plaintiff.

Phillip L. Sternberg, Esq., Couzens, Lansky, Farmington Hills, MI, for Defendant.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Robert James Watkins commenced this suit in this Court on November 3, 2000, asserting federal constitutional claims under 42 U.S.C. § 1983 and state-law claims of false arrest and false imprisonment arising from his arrest in the early morning hours of May 7, 2000 as part of a police raid of a "techno" music and dance party at a hall leased by Plaintiff's corporation, Late Night Entertainment, Inc. In support of these claims, Plaintiff alleges that Defendants lacked probable cause to arrest him, and that, in any event, Defendants acted unreasonably in carrying out this arrest by placing him in handcuffs and leading him past television cameras as they escorted him to a squad car.

By motion filed April 30, 2002, Defendants now seek summary judgment in their favor on all of Plaintiff's claims. In support of this motion, Defendants contend that probable cause existed to arrest Plaintiff, in light of the observations of some of the Defendant police officers (i) that underage children were violating a municipal curfew and that controlled substances were being sold and used at the techno party, and (ii) that Plaintiff was on the premises and appeared to possess a degree of control over the use of the hall by the partygoers. Defendants further assert that Plaintiff has failed to identify any conduct tantamount to gross negligence, such that Defendants would forfeit their governmental immunity from liability under Plaintiff's state-law tort theories. Plaintiff filed a response to this motion on May 29, 2002, arguing that his mere presence in the building on the night in question did not give Defendants probable cause to arrest him, particularly for the misdemeanor offenses now cited by Defendants as justification for the arrest, and that issues of fact remain as to the reasonableness of the manner of Plaintiff's arrest. Defendants submitted a reply brief in further support of their motion on June 11, 2002.

On November 7, 2002, this Court held a hearing on Defendants' motion. Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and the other materials in the record, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

### II. FACTUAL BACKGROUND

Plaintiff Robert James Watkins is a well-known independent producer and television and radio personality in Highland Park and Detroit, Michigan. Several of his productions have appeared over the years on Channel 62 in Detroit, back when this station was locally owned.[1] For approximately the past five years, Plaintiff's corporation, Late Night Entertainment, Inc., has leased a 12,420 square foot building at Woodward Avenue and Midland Street in Highland Park. This building houses radio, television, and recording studios, Plaintiff's corporate offices, and "Studio 95," a hall and studio used for concerts and television productions. These premises are served by three separate entrances: 15849 Woodward, site of the TV, radio, and recording facilities; 15851 Woodward, where Plaintiff's office is located; and 19 Midland Street, the entrance to Studio 95.

### A. Plaintiff's Sublease of Studio 95 to Detroit Underground Productions

Plaintiff periodically sublets the Studio 95 facility to promoters for concerts or

---

1. This station was acquired by CBS in the mid–1990s.

"techno" music parties. On April 17, 2000, Plaintiff's corporation entered into a five-year sublease with Detroit Underground Productions, Inc., calling for a payment of $2,000 for each event that Detroit Underground held on the Studio 95 premises, and granting Detroit Underground a right of first refusal concerning any other proposed event at this facility.[2] This sublease further stated:

> The parties agree that they will not be involved, directly and/or indirectly, in any illegal activity inside and/or around the property known as Studio 95, which will compromise the promotion of the events that will be held. If any illegal activity does occur from any of the persons listed above [*i.e.*, the parties to the sublease], either party shall have the option to terminate this agreement immediately.

(Plaintiff's Response, Ex. B, Sublease at ¶ 8.)

By its terms, this sublease commenced on May 5, 2000. That same day, one of the principals of Detroit Underground, Carl G. Smith, wrote to the Mayor of Highland Park, Linsey Porter, to explain his plans for the Studio 95 facility. This letter acknowledged that a recent event at Studio 95 had received negative publicity in the local media, but promised that the events to be held by Detroit Underground would be far different:

> Due to the recent news broadcast that took place on Wednesday May 3, 2000 on Channel 2 "Fox" at 10:07 p.m. I feel it necessary to explain to you some of our plans that we have with Studio 95 located at 15851 Woodward Avenue Highland Park, MI 48203.
>
> During the broadcast several issues were brought to the attention of the public. Fox 2 played hidden undercover

video tape that was obtained by them during recent "rave" parties that had taken place in the city of Detroit, as well as, the city of Highland Park. The party they showed in Highland Park took place at Studio 95 on April 8, 2000 it was called "True Masters 2" and featured the notorious hip-hop group "The Wu–Tang Clan," the Production Company that held the "rave" was BTM Productions. The footage that they showed from that party included: Open using and distribution of narcotics; The Promoters openly selling "balloons" filed with Nitrous Oxide; Open nudity and sexual acts being performed by dancers hired by the Promoter; And enormous amounts of trash left outside for days. These are the main points that they touched on, and personally I do not blame them. There is obviously a serious problem when a Promoter such as the one who held the "rave" in question can hold an event such as this, have absolutely no respect for the Law, and not have the "rave" closed down.

> When this event took place we were extremely concerned with the damage that it may have caused. But, when I watched the Fox 2 news report I was actually pleased. I was pleased because everything they showed and everything that BTM's "rave" was, is exactly what we are not. Fox 2 is not the only news organization running stories like this one. On Tuesday May 2, 2000 Dateline NBC ran a segment on "raves" in Colorado, similar to Fox 2's report. But again I was pleased, we are not involved with promoting "raves" we are involved with opening a non-alcoholic Night Club, a very safe alternative to the "raves," for young adults.

---

2. An exception was made for events conducted by Plaintiff's TV or radio stations, provided that Detroit Underground gave its written agreement that this proposed use of the facility did not conflict with any event it was promoting.

Several months back my partner, Felton Howard, and Myself began to execute a project that we have been working on. We wanted to open a Club that was like no other. Though in our beginning stages of planning we lacked a suitable building. Then he had suggested Studio 95, it was perfect, the place already has musical history behind it, The New Dance Show, which is a Legend. It is clean, very spacious, centrally located and carries a very good reputation. A few months back we began to have meetings with R.J. Watkins. He approved on this venture for it is going to bring stability and life back to Studio 95, something that has not been present there since The New Dance Show. He also saw the need to get away from these "rave" parties and allow Studio 95 to take shape as a viable entity.

(Plaintiff's Response, Ex. C, Smith 5/5/2000 Letter at 1–2.)

Smith went on to outline his specific plans for the facility, including a grand opening event to be held the next day, May 6, 2000. He stated that "[w]e will enforce a strict Zero Tolerance Policy on Drugs and Alcohol," that guests would be subjected to a pat-down search before being allowed to enter the club, and that thirty security officers had been hired to police the interior and exterior of the building. (*Id.* at 2.) In closing, Smith stated that "[t]he 'rave' that took place at Studio 95 on April 8, 2000 was a travesty and a disgrace to your Community," but that "[w]hat we are going to open is not a 'rave' but a very well organized safe alternative to this apparent problem." (*Id.* at 3.)

Plaintiff himself has acknowledged that problems arose at the April 8, 2000 party at Studio 95. He testified that he was on the premises that night, going back and forth between the party and his office, and that he shut down the party early, at around 4:30 a.m., because it had gotten "too big." (Plaintiff's Response, Ex. A, Plaintiff Dep. at 28–30.) Plaintiff also appeared before the Highland Park City Council following this event to address complaints of noise, too many people, and excessive accumulation of trash outside the facility, and to assure the council that "we don't condone such operations" and that the promoter of the April 8 event "would not be allowed to use the building again." (*Id.* at 43.) Plaintiff testified, however, that he did not observe the sale or use of drugs at the April 8 party, nor did he see any partygoers who appeared to be underage. Regarding the May 3, 2000 Fox 2 news broadcast that appeared to depict illegal activity at the April 8 event, Plaintiff opined that the story was edited to include footage from several different parties, so that it was unclear which portions involved Studio 95.

## B. Defendants' Investigation of the Planned May 6, 2000 Event at Studio 95

The April 8 event at Studio 95 and the May 3 Fox 2 news broadcast also caught the attention of Highland Park law enforcement officials. According to Defendant Theodore Cadwell—at that time, the Deputy Chief of Public Safety for the Defendant City of Highland Park, and now Highland Park's Chief of Public Safety—he first learned about "rave" parties in his community when Plaintiff appeared before the Highland Park City Council in the aftermath of the April 8 event. (*See* Plaintiff's Response, Ex. E, Cadwell Dep. at 26–27.) Cadwell further testified that the Fox 2 broadcast and his discussions with others within the law enforcement community had alerted him to the possibility of illegal activities at "rave" parties. (*See id.* at 108.)

On or around the date of the Fox 2 report, Deputy Chief Cadwell received a fax and telephone call from the Wayne County Prosecutor's office, informing him that an apparent "rave" party was scheduled for the following Saturday, May 6, 2000, at the Studio 95 facility. Cadwell forwarded this information to the supervisor of the police department's narcotics division, Defendant Sergeant Rose Logan, with instructions that she investigate the matter further. At the conclusion of this investigation, Sergeant Logan reported back to Deputy Chief Cadwell, recommending that undercover officers attempt to gain admission to the May 6 event at Studio 95.

During this same time period, Cadwell was contacted by a Fox 2 reporter, Fanchon Stinger, and a Fox 2 producer, who were continuing their investigation into "raves" and apparently sought to "compare notes" as to any investigation of these events by the Highland Park police. Through these conversations, Cadwell determined that more officers should be assigned to the forthcoming weekend event at Studio 95, in light of the number of people who were likely to attend the party, and he also learned of an informant who could provide the necessary "introduction" that would enable the City's undercover officers to gain entry to this "invitation only" event.

Deputy Chief Cadwell gave his approval for the operation recommended by Sergeant Logan, and authorized the use of the informant identified by the Fox 2 producer.[3] Cadwell also invited the Fox 2 reporter, producer, and informant to a police department briefing held on Saturday evening, May 6, 2000, just prior to the commencement of the undercover investigation at Studio 95. According to Cadwell, these individuals were invited to the briefing so that the undercover officers could confer with the informant regarding their attempt to gain entry into the party, and to indicate to the Fox 2 producer and reporter that they could "stand back and observe if police action was taken," but that "they weren't to enter the premises · with us." (*Id.* at 47–48.) Cadwell testified that the presence of the Fox 2 personnel and cameras that night were "all part of the trade-off" for gaining the services of the TV station's informant. (*Id.* at 83.)

## C. Defendants' Raid of the May 6, 2000 Event and Arrest of Plaintiff

Following the evening briefing on May 6, 2000, two Highland Park police officers, Defendants Robert Fruit and Colon Trombetta, traveled to Studio 95 in plain clothes, gained entry to the techno party being held on the premises that night, and began their undercover investigation of illegal activity at the party. According to an incident report prepared by Officer Fruit in the early morning hours of May 7, 2000,[4] as well as an affidavit he submitted in support of Defendants' motion, the undercover officers were subjected to a pat-down search upon entering Studio 95, but were not asked to show any identification. Officer Fruit stated that, once inside the facility, he (i) observed apparent narcotics transactions occurring in plain view on the

---

**3.** The then-Chief of Public Safety, Defendant Ronald Parham, Sr., apparently was informed of these developments, but played only a minimal role in the investigation and subsequent raid of Studio 95.

**4.** Somewhat inexplicably, Defendants failed to provide a copy of this incident report for the Court's review, even though the brief in support of their motion refers to facts that could only have come from this report. Plaintiff, however, has submitted an abbreviated version of Officer Fruit's report, and a complete copy of this document was provided by the plaintiffs in a related case before this Court, *Colosimo v. City of Highland Park,* No. 01–73458.

dance floor and in the bathroom area, (ii) saw and smelled marijuana being smoked on the dance floor and around the bathrooms, (iii) observed partygoers who appeared to be under the age of 16, and (iv) was approached by an unknown male who offered to sell him a pill represented to be the drug "Ecstacy," which Fruit purchased for $40. Fruit further stated that he witnessed Plaintiff walking around the dance floor on several occasions, in the midst of what appeared to be open marijuana and alcohol use, and that Plaintiff was observed carrying a large ring of keys, occasionally speaking over a two-way walkie-talkie radio, and interacting with security guards, concession stand employees, and one of the party promoters (apparently Carl Smith).

Fruit stated that he and Officer Trombetta remained on the premises until about 1:30 a.m. on May 7, after which they met with Deputy Chief Cadwell and the remainder of the investigative unit at a nearby staging area and reported their findings. Based on these reports, Cadwell ordered a raid of Studio 95, instructing his team to "secure the premises and make arrests." (Defendants' Motion, Ex. 10, Fruit Aff. at ¶ 9.) Although Cadwell does not often accompany his officers on arrests, he testified that he did so on this occasion in order to supervise the officers and help to ensure their safety "in what could be a dangerous situation," and "to make sure because the media was involved, that they did not overstep their bounds." (Cadwell Dep. at 57.) Apart from this latter concern, Cadwell stated that the presence of Fox 2 personnel had "nothing to do with" his decision to accompany his officers on the raid of Studio 95. (Id. at 65.) Cadwell acknowledged, however, that he had agreed earlier that evening that, in the event of a raid, he would make himself available for an interview by the Fox 2 reporter. (Id. at 76–77.)

Pursuant to Cadwell's orders, a team of Highland Park police officers raided Studio 95 in the early morning hours of May 7, 2000. Officer Fruit stated that, upon reentering the building with a number of uniformed officers, he observed a security guard yelling "five, five, five" into a walkie-talkie. Fruit later found a document indicating that "five" was the radio code for the police. He and other officers also seized pills and bags of suspected marijuana, cocaine, and heroin from the dance floor,[5] and demanded that the partygoers produce identification. This investigation revealed that 45 individuals were under the age of 16, in apparent violation of a Highland Park curfew ordinance which prohibits minors from frequenting "place[s] of amusement" between 10:30 p.m. on Saturday nights and 6:00 a.m. the following morning. (See Defendants' Motion, Ex. 3, Highland Park curfew ordinance.)

Deputy Chief Cadwell remained outside the premises during this raid, receiving periodic reports from his officers. Approximately ten or twenty minutes after the raid commenced, Defendants Logan and Love reported that the officers had discovered what they believed to be evidence of drug usage at the party, and that they had detained but not yet arrested certain individuals who appeared to be sponsors or persons who had some degree of control over the party. Cadwell also was reminded that undercover officers Fruit and Trombetta previously had noted Plaintiff's presence at the party, exhibiting certain indicia of his control of the premises. As Cadwell discussed the matter with Logan and Love, they observed that Plain-

---

**5.** Although defense counsel alluded at Plaintiff's deposition to Michigan State Police reports that allegedly confirmed the discovery of unlawful substances at the party, (see Plaintiff's Dep. at 63), nothing in the record before this Court sheds any light on this question.

tiff was at that moment being interviewed by the Fox 2 reporter. The officers pointed out Plaintiff to Cadwell, and the Deputy Chief ordered that Plaintiff be arrested for the offense of contributing to the delinquency of minors. (*See* Cadwell Dep. at 89–91.)

Plaintiff also has testified regarding the circumstances surrounding his arrest. He stated that he arrived at the premises at around 11:00 p.m. on May 6, with the party scheduled to begin at about 11:30 p.m. He spent part of the evening in his office, but periodically checked in on the event at Studio 95. Plaintiff testified that he spoke with at least one of the party promoters, and he confirmed that he was carrying a set of keys for the building, and that he communicated with security and concessions personnel during the evening.[6] According to Plaintiff, he maintained a separate security staff to "protect the building, make sure nothing went wrong," and to ensure that partygoers remained in the Studio 95 portion of the building, while the promoters' security staff were responsible for searching people as they entered the party to ensure that they were not carrying drugs. (Plaintiff's Dep. at 83.)

Plaintiff testified that he did not observe any illegal activity during his visits to Studio 95 that evening. He was not aware that any of the partygoers were underage, nor that drugs were being sold or used at the party. Plaintiff acknowledged, however, that he would not have been able to identify the use of drugs even if it had occurred right in front of him, and that he "wouldn't know [E]cstasy if I tripped over

it." (*Id.* at 27, 37.) He also conceded that, as a result of the police investigation, he is now aware that underage children were, in fact, present at the May 6 event. (*See id.* at 62.) Finally, concerning his control of the premises, Plaintiff affirmed that he had the power to terminate the party on the spot if he had perceived any illegal activity that night. (*See id.* at 55.)

At the time Defendants commenced their raid, Plaintiff was in his office. Some of the Defendant police officers went to Plaintiff's office entrance at 15851 Woodward and advised him of their investigation, to which Plaintiff responded, "[I]f somebody's doing something wrong back there [in Studio 95], lock 'em up." (*Id.* at 79.) A few minutes later, Plaintiff and the officers walked over to the location of the party, where Plaintiff observed that the partygoers had been lined up against the wall. For the next hour or so, Plaintiff traveled back and forth between his office and Studio 95, occasionally pointing out to the police those individuals on the premises who worked for him.[7]

At some point, Plaintiff noticed that Fox 2 reporter Fanchon Stinger was in the building. He asked a police officer to remove her from the premises because "[s]he has no business being here," and the officer complied with this request. (*Id.* at 77.) When Plaintiff later observed that the reporter had reentered the premises, he approached her and stated, "if you want to do an interview, if you act like you had some sense I'll give you a tour to show you what we're doing here, the radio, TV, recording studio and the office." (*Id.*)[8]

---

**6.** Plaintiff stated that he controlled the operation of the concession stands and received the profits from this operation, in addition to the $2,000 fee called for under the sublease.

**7.** During this time, the police were engaged in a lengthy process of checking the identification of each of the several hundred individuals who were found on the premises. It appears, as a general rule, that those who were

determined to be age 18 or older were released, while those younger than 18 or lacking proper identification were detained.

**8.** Although Plaintiff testified that this discussion occurred inside the premises, Deputy Chief Cadwell indicated that he observed Plaintiff being interviewed by the Fox 2 reporter outside the building, and the Fox 2

Plaintiff acknowledged at his deposition that this exchange with the television reporter occurred before his arrest, and that Defendants did not force him to participate in an interview with the reporter.

An hour or more after the commencement of the raid on Studio 95, at approximately 3 o'clock or 3:30 a.m., Plaintiff was approached by Highland Park police officers and told that Deputy Chief Cadwell had ordered his arrest. At the time, Plaintiff was in the portion of the building housing the TV and radio studios, and he requested that the officers take him out the 15849 Woodward entrance to this part of the building. More generally, Plaintiff protested that he should not be arrested at all, and that he wished to speak to the Deputy Chief regarding the basis for his arrest. The police disregarded these requests, however; instead, they handcuffed Plaintiff and led him out the Midland Street entrance to the building, where his arrest was captured by Fox 2 news cameras.[9]

Plaintiff was taken to the Highland Park police station in a squad car. Initially, he was placed on a stool behind the front desk at the station, but was not permitted to speak to his wife when she arrived at the station and stood just a few feet away from him. Plaintiff subsequently was moved to a holding cell with several other people, including promoter Carl Smith. He was released at around 8:00 a.m. upon posting a $500 bond. About ten days later, Plaintiff appeared in court and was told "[t]here is no case against you, there's no paper work." (Plaintiff's Dep. at 93–94.)

No charges have ever been brought against Plaintiff arising from the incidents on May 6 and 7, 2000. Through the present action, Plaintiff challenges the legality of his arrest and detention in the early morning hours of May 7, as well as the reasonableness of the manner in which Defendants carried out his arrest.

## III. ANALYSIS

### A. The Standards Governing Defendants' Motion

In their pending motion, Defendants seek an award of summary judgment in their favor on all of the claims asserted in Plaintiff's Complaint. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

footage of the interview apparently confirms this.

9. The parties dispute whether Plaintiff was advised of the grounds for his arrest. Plaintiff indicates that he was told simply that Deputy Chief Cadwell had ordered his arrest, and that the Deputy Chief would explain further at the police station. However, one of the arresting officers, Defendant Brenda Stevenson, testified that she advised Plaintiff that he was being arrested on a charge of loitering where narcotics are kept or stored. (See Plaintiff's Response, Ex. F, Stevenson Dep. at 42–44.) Defendants state in their motion that such conduct violates a Highland Park ordinance.

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

Upon reviewing this trilogy of decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motion.

**B. The Existence of Probable Cause Defeats Plaintiff's Federal Constitutional and State–Law Claims of False Arrest and False Imprisonment.**

In his complaint, Plaintiff challenges both the basis for and the manner of his arrest following Defendants' raid of the May 6, 2000 event at Studio 95. Regarding the first of these challenges, Plaintiff appeals to both his federal Fourth Amendment right to be free from unreasonable seizures, and the Michigan tort law prohibition against false arrest and imprisonment. Defendants counter that probable cause existed to arrest Plaintiff, and that this serves to defeat Plaintiff's federal and state law claims alike on this point. The Court agrees.

It is undisputed that Defendants did not secure a warrant before raiding Studio 95 or arresting Plaintiff. Nonetheless, "arrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir.1988). Similarly, in order to establish a claim of false arrest or false imprisonment under Michigan law, Plaintiff "must show that his arrest was not legal, i.e., without probable cause." *Adams v. Metiva*, 31 F.3d 375, 388 (6th Cir.1994); *see also Brewer v. Perrin*, 132 Mich.App. 520, 349 N.W.2d 198, 201 (1984) (holding that the absence of probable cause is an element of a state-law claim of false arrest or imprisonment). In addi-

tion, the individual Defendants point out that they enjoy governmental immunity from tort liability under Michigan law so long as their conduct "does not amount to gross negligence," Mich. Comp. Laws § 691.1407(2)(c). The existence of probable cause has been held to negate any such allegation of gross negligence as a matter of law. *See Bell v. Fox*, 206 Mich.App. 522, 522 N.W.2d 869, 871 (1994).

Accordingly, the disposition of Plaintiff's challenge to his arrest and detention turns upon the existence of probable cause for Defendants to arrest him. The Sixth Circuit has described the standards that govern this inquiry:

> The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Probable cause requires only the probability of criminal activity [and] not some type of "prima facie" showing. If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant. A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent. The question becomes, viewing the facts in a light most favorable to plaintiff, whether the arresting officers were justified in their belief that plaintiff had probably committed or was committing a crime.

*Criss,* 867 F.2d at 262 (citations and footnote omitted). The Michigan courts have described the probable cause inquiry in nearly identical terms. *See, e.g., People v. Mitchell,* 138 Mich.App. 163, 360 N.W.2d 158, 161 (1984); *Brewer,* 349 N.W.2d at 201.

Applying these standards to the circumstances presented here, the Court readily concludes as a matter of law that Defendants had probable cause to arrest Plaintiff. Defendants have identified a variety of ordinances and Michigan statutes that the Highland Park officers reasonably could have believed had been violated by Plaintiff. First, they cite a Highland Park ordinance which prohibits persons from "loiter[ing] about" places where controlled substances are stored or kept. (*See* Defendants' Motion, Ex. 2, Highland Park Ordinance No. 620.03(h).) Next, Defendants point to Highland Park's curfew prohibiting minors from frequenting "place[s] of amusement" after 10:30 p.m. on Saturdays, and they cite the city ordinance which makes it unlawful to "assist, aid, abet or encourage" such a curfew violation. (*See* Defendants' Motion, Ex. 4, Highland Park Ordinance No. 658.99(h).) Finally, Defendants contend that they had probable cause to arrest Plaintiff for violating the Michigan statutes making it unlawful to contribute to the delinquency of a minor, Mich. Comp. Laws § 750.145, and prohibiting "an owner, tenant, or other person having control over any premises" from "[k]nowingly allow[ing] any individual to consume or possess a controlled substance at a social gathering on or within that premises," Mich. Comp. Laws § 750.141a(2)(b).

■ The Court need not analyze each and every one of these potential offenses separately, because Plaintiff challenges the existence of probable cause on two more general grounds. First, he suggests that Defendants have not been altogether clear in identifying their basis for arresting him, raising, in his view, an inference of an improper motive for his arrest. And, to be sure, Deputy Chief Cadwell testified that he ordered Plaintiff's arrest for the offense of contributing to the delinquency of a

minor, while one of the arresting officers, Brenda Stevenson, testified that she told Plaintiff he was being arrested for loitering in a place where controlled substances are stored or kept. Yet, as is clear from the above-quoted holding in *Criss,* this Court assesses the existence of probable cause under an objective standard, asking whether a prudent person in the arresting officers' position would have been justified in believing that Plaintiff had committed a crime. *See Criss,* 867 F.2d at 262; *see also Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). It does not matter, then, what beliefs these officers actually held regarding the particular ordinance or statute that Plaintiff had violated, so long as the circumstances, viewed most favorably to Plaintiff, would have established probable cause to arrest Plaintiff for at least one of the above-cited offenses.

Next, Plaintiff argues that Defendants cannot refute his claimed unawareness that minors were present and controlled substances were being used and sold on the premises. It follows, according to Plaintiff, that Defendants lacked probable cause to arrest for any offense that requires knowing or intentional misconduct, or that, at a minimum, there remains a factual dispute on this issue. Likewise, to the extent that a Highland Park ordinance or Michigan statute includes "control" as an element of prohibited conduct, Plaintiff contends that the event promoter, and not he, was responsible for policing the activities of the partygoers, so that there is an issue of fact, at least, as to Plaintiff's degree of control over the premises. In sum, Plaintiff maintains that "the most that Defendants can show is that Mr. Watkins was present at a building where there were 700–1,000 young people, some of whom may have been underage and a few of whom may have been in possession of con-

trolled substances." (Plaintiff's Response at 20.)

■ Initially, as a factual matter, the Court is not prepared to agree with Plaintiff's contention that his degree of control over the premises remains an open question. Plaintiff himself testified that he had the authority to shut down the May 6 event if he had perceived that illegal activity was occurring, (*see* Plaintiff's Dep. at 55); he simply denied that he observed any activity that would warrant this exercise of control. He further confirmed this degree of control by recounting his decision to shut down the prior, April 8 event at Studio 95 upon determining that it had grown "[t]oo big." (*See id.* at 29–30.) While the event promoter might *also* have possessed the authority to police and shut down the May 6 event, and might perhaps have borne the *primary* responsibility to take such action, nothing in the above-cited statutes or ordinances requires exclusive or principal control in order to establish a criminal violation.

■ More fundamentally, Plaintiff confuses the distinct notions of factual certainty and probable cause. It is not necessary that Defendants *prove,* or even establish to some relatively high degree of certainty, that Plaintiff actually *knew* that minors were present at the May 6 event, or that controlled substances were being sold or used at the party. If this were the rule, it would be exceedingly difficult for the police to establish probable cause to arrest for any offense that includes knowledge or intent as an element. While a prosecutor's decision not to pursue charges might well turn upon the difficulty of proving such knowledge or intent beyond a reasonable doubt—and, for all we know, this might have contributed to the decision not to bring charges in this case—the law does not dictate this sort of calculus as a precursor to a lawful arrest.

Nor does it matter that Plaintiff, if given a sufficient opportunity to address the matter at the time, might have been able to persuade Defendants that his arrest was unnecessary and unwarranted. The Sixth Circuit has rejected any such broad "duty to investigate" as an element of a police officer's probable cause determination:

> Plaintiff in effect asserts that absent a reasonable investigation by the officers, plaintiff's innocent explanation of his [conduct] negated the officers' reasonable belief that an offense had been committed. A suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause to arrest exists. A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.

*Criss,* 867 F.2d at 263 (citations omitted). "To hold otherwise," the Court reasoned, "would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me,'" with the arresting officer subject to suit whenever he "failed to investigate such claims prior to arrest." 867 F.2d at 263.

■ Thus, the Court returns to the inquiry described above—namely, whether, under the circumstances presented, a prudent person would have been justified in believing that Plaintiff had committed one or more of the criminal offenses outlined earlier. The Court finds that the record resolves this issue in Defendants' favor as a matter of law. For example, regarding the Michigan statute which prohibits "an owner, tenant, or other person having control over any premises" from "[k]nowingly allow[ing] any individual to consume or possess a controlled substance at a social gathering on or within that premises," Mich. Comp. Laws § 750.141a(2)(b), the relevant facts and circumstances presented at the time indicated: (i) that Plaintiff exercised some degree of control over the premises, where he carried a ring of keys, occasionally spoke to the security guards and concession employees, and interacted with a person believed to be promoting the event; and (ii) that what appeared to be controlled substances were being openly consumed and sold on the premises, with Plaintiff seemingly able to observe this as he periodically walked among the partygoers. Indeed, since Plaintiff was not himself a partygoer, it is difficult to conceive of any purpose in his occasional visits to the event other than to keep an eye on the proceedings and take any action he deemed necessary to preserve his interest in the premises. An officer who observed Plaintiff under these circumstances would be justified, as a matter of law, in believing that he had probable cause to arrest Plaintiff for a suspected violation of Michigan law.

Many of these same circumstances also would provide probable cause to arrest Plaintiff for violating the Highland Park ordinance which makes it unlawful to "assist, aid, abet or encourage" a minor's curfew violation. Again, Plaintiff appeared to exercise some control over the premises, and Defendants also could have reasonably believed—correctly, as it turned out—that he was in charge of the concession stands, seemingly providing a profit motive for Plaintiff to encourage the admission of as many partygoers as possible. Moreover, the undercover officers were not asked for identification before entering the party, and their observations indicated that a number of attendees appeared to be under the age of 16—a belief which, once again, proved to be well-founded. Given Plaintiff's unquestioned opportunity to make

this same observation as he passed through the premises, the officers reasonably could have believed that Plaintiff was knowingly allowing the party to continue despite the presence of minors in violation of a Highland Park curfew.

■ Finally, even accepting that Defendants had probable cause to arrest him, Plaintiff asserts that something more was required here, where all of the above-cited offenses are misdemeanors or municipal ordinance violations. In particular, Michigan law authorizes warrantless arrests for misdemeanor offenses or ordinance violations only if "committed in the peace officer's presence." Mich. Comp. Laws § 764.15(1)(a); *see also Risbridger v. Connelly,* 275 F.3d 565, 568 n. 2 (6th Cir.2002). Plaintiff seems to suggest that this requirement of "presence" was not satisfied here, where the undercover officers observed what they believed to be illegal conduct, but where Plaintiff was arrested by different officers who lacked any first-hand knowledge of such alleged illegality.

This contention is belied, however, by one of the very cases cited by Plaintiff. In *People v. Dixon,* 392 Mich. 691, 222 N.W.2d 749, 751 (1974), the Michigan Supreme Court recognized that "a police officer may not utilize information received from third persons as a basis for a warrantless misdemeanor arrest," but then held that "[a]nother police officer is not a third person within that policy." Thus, *Dixon* and other Michigan decisions have adopted a "police team" interpretation of the "presence" requirement, under which "officers who are working together on a case [may] combine their collective perceptions" in order to confirm that all of the elements of a misdemeanor offense have occurred in their "presence." *Dixon,* 222 N.W.2d at 751; *see also People v. Palma,* 111 Mich.App. 684, 315 N.W.2d 182, 185 (1981); *People v. Ward,* 73 Mich.App. 555, 252 N.W.2d 514, 516 (1977). The Sixth Circuit has recognized a similar principle, holding that "probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." *United States v. McManus,* 560 F.2d 747, 750 (6th Cir.1977). Consequently, the officers who actually arrested Plaintiff, and the Deputy Chief who ordered this arrest, were entitled to rely on the suspected criminal conduct which occurred in the presence of the undercover officers.

## C. The Manner of Plaintiff's Arrest Did Not Violate the Fourth Amendment.

■ Next, apart from challenging the basis for his arrest, Plaintiff maintains that his Fourth Amendment rights were violated through the manner in which Defendants carried out this arrest. Although Defendants presumably could have led Plaintiff out the nearest Woodward exit from the building, as he had requested, Plaintiff instead was escorted out the Midland Street exit, where television cameras were able to capture his arrest. Plaintiff contends that this "parade" past the cameras, an arrest purportedly "staged" for the television news, constituted an unreasonable seizure in violation of the Fourth Amendment. Whatever the reach of the Fourth Amendment in regulating the manner of arrests, however, the Court finds no support in the record for any such claimed violation in this case.

Plaintiff's challenge rests principally upon the Second Circuit's decision in *Lauro v. Charles,* 219 F.3d 202 (2d Cir.2000), which holds that a staged "perp walk" for the benefit of the press violates the Fourth Amendment, at least where it lacks any legitimate law enforcement justification. In that case, the plaintiff suspect, John Lauro, had already been arrested and taken to the police station when the defendant detective, Michael Charles, received a phone call from the police department's

Deputy Commissioner of Public Information stating "that the media were interested in Lauro's case and that Lauro should be taken on a perp walk." *Lauro*, 219 F.3d at 204. Charles then handcuffed Lauro and led him out of the station house, placed him in an unmarked car and drove him around the block, and then removed him from the car and walked him back into the station house while being filmed by a Fox 5 television news crew.

The District Court held that this staged "perp walk" violated Lauro's Fourth Amendment rights, and the Second Circuit agreed. In so ruling, the Second Circuit looked primarily to *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), in which the Supreme Court held that a "media ride-along" as police officers executed an arrest warrant in a private home violated the Fourth Amendment. The Second Circuit read *Wilson* as establishing two principles: (i) that the Fourth Amendment regulates both the fact and manner of searches and seizures, dictating that they be reasonable in both of these senses; and (ii) that reasonableness "must be judged, in part, through an assessment of the degree to which [the police's] actions further the legitimate law enforcement purposes behind the search or seizure." *Lauro*, 219 F.3d at 211.

Analyzing Lauro's "perp walk" in light of these principles, the Court concluded that it was unlawful:

[I]n the case before us, the initial arrest was, we assume, perfectly lawful. But in staging the perp walk, Detective Charles engaged in conduct that was unrelated to the object of the arrest, that had no legitimate law enforcement justification, and that invaded Lauro's privacy to no purpose. By exacerbating Lauro's seizure in an unreasonable manner, Charles violated the Fourth Amendment.

*Lauro*, 219 F.3d at 213 (citation omitted). Significantly, however, the Second Circuit immediately explained that its ruling was narrowly circumscribed:

It is important ... to understand the limitations of our holding. First, we do not hold that all, or even most, perp walks are violations of the Fourth Amendment. Thus, we are not talking about cases in which there is a legitimate law enforcement justification for transporting a suspect. Accordingly, we do not address the case—seemingly much more common than the kind of staged perp walk that occurred here—where a suspect is photographed in the normal course of being moved from one place to another by the police. Nor do we reach the question of whether, in those circumstances, it would be proper for the police to notify the media ahead of time that a suspect is to be transported.

219 F.3d at 213.[10]

Leaving aside the fairly substantial question whether *Lauro*'s somewhat expansive reading of *Wilson* is warranted,[11]

**10.** In addition, the Second Circuit ordered that judgment be entered in favor of the defendant on the ground of qualified immunity, reasoning that the unlawfulness of a staged "perp walk" was not clearly established at the time of Charles's actions. *See Lauro*, 219 F.3d at 214–16. This same defense might well have been availing to Defendants here, but they failed to identify it as a ground for their motion.

**11.** In particular, the media in *Wilson* actually accompanied the arresting officers inside the suspect's home, and directly observed the confrontation between the suspect and officers in the living room. *See Wilson*, 526 U.S. at 607–08, 119 S.Ct. at 1696. *Lauro* recognizes that the ruling in *Wilson* turned in part upon "the sanctity of the private home, and the particular gravity the Fourth Amendment accords to governmental intrusions on that privacy." *Lauro*, 219 F.3d at 211. Neverthe-

this Court finds that the facts here are far different from those at issue in *Lauro*. It was clear in *Lauro* that the "perp walk" was staged, that the police otherwise would not have removed the suspect from the station house, and that the police and media had specifically communicated about the latter's desire to capture Lauro's arrest on film. There is no analogous evidence in this case as to any of these points. Plaintiff's arrest was still in progress when it was filmed by the Fox 2 cameras, and Defendants clearly had to lead him out *one* of the building's exits in order to transport him to the station house. Even if they had used the exit requested by Plaintiff, it is possible that the TV cameras still would have filmed Plaintiff as he was led to a squad car, and Defendants plainly had no affirmative obligation to position one of their cars to avoid this possibility.[12] Finally, there is no evidence of any communications between Defendants and the media for the purpose of filming Plaintiff's arrest. In short, this case presents the precise circumstances that the *Lauro* Court expressly declined to reach—namely, an unstaged arrest in which Plaintiff "was photographed in the normal course of being moved from one place to another by the police." *Lauro*, 219 F.3d at 213.

Two New York District Courts have distinguished *Lauro* on many of these same grounds. In one case, the plaintiff corrections officers were arrested on suspicion of filing false job injury claims. *See Caldarola v. County of Westchester*, 142 F.Supp.2d 431, 433 (S.D.N.Y.2001). The defendant law enforcement officials arranged for a government employee to videotape the plaintiffs as they were led out of the Department of Corrections headquarters in handcuffs and placed into police cars, and excerpts of this videotape then were played during a press conference announcing the plaintiffs' arrests. Later, when the plaintiffs were transported to the courthouse, they alleged that the defendants waited until the media were present before removing them from the police vehicles and taking them inside.

The District Court held that neither of these "perp walks" was unconstitutional. The Court read *Lauro* as limited to cases involving "fictional recreation" of an arrest, and noted that the events filmed in the case before it were "legitimate law enforcement activit[ies]." *Caldarola*, 142 F.Supp.2d at 440, 443. As to the videotaping of the plaintiffs' initial arrests, the Court found that these arrests were "choreographed" but not "staged," and hence did not come within the rule of *Lauro*. 142 F.Supp.2d at 440. Regarding the courthouse "perp walk," the Court reasoned:

> Even if the courthouse "perp walk" could be considered a seizure for purposes of the Fourth Amendment, it did not violate plaintiffs' constitutional rights, because there was a legitimate law-enforcement reason for leaving the police station and bringing plaintiffs into

---

less, the Second Circuit found that *Wilson* did not "turn[] solely on the special status of the home," and that "the Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure," even where this aggravating conduct occurs outside a home. *Lauro*, 219 F.3d at 211–12. This is indeed an interesting issue, but one which the Court need not resolve here.

12. Indeed, though the record is not clear on this point, it appears that the exit chosen by Defendants might well have been the one closest to the waiting squad car. Plaintiff testified that he was unsure where the squad cars were located, but that he asked the arresting officers to "get on the radio and have a police [car] come on Woodward and let's go." (Plaintiff's Dep. at 95.) This seems to suggest that it would have been necessary to move a squad car in order to accommodate Plaintiff's request.

the M[t]. Pleasant courthouse—namely, their arraignment. Assuming, *arguendo*, that what the police were doing outside the courthouse was waiting for the press to arrive, I am not persuaded that this action unconstitutionally aggravated the legitimate seizure that occurred when plaintiffs were arrested. The fact is, plaintiffs' arrest was a newsworthy event. The press could not be kept from covering it, and the police are not constitutionally compelled to make their job more difficult.

*Caldarola,* 142 F.Supp.2d at 443.

More recently, in *Otero v. Town of Southampton,* 194 F.Supp.2d 167, 181 (E.D.N.Y.2002), the District Court rejected a Fourth Amendment challenge to a "perp walk" filmed by a local television station as the plaintiff was being transported to his arraignment. The Court observed that, in contrast to *Lauro,* "[t]here was no staged recreation here," and held that "[t]ransporting Plaintiff to his arraignment qualifies as a legitimate law enforcement purpose." *Otero,* 194 F.Supp.2d at 181.

As in *Caldarola* and *Otero,* the arrest of Plaintiff in this case was neither fictitious nor staged. Indeed, in contrast to *Caldarola,* there is no evidence here from which it could even be inferred that Plaintiff's arrest was "choreographed," or that the presence of cameras caused the arresting officers to do something different from what they otherwise would have done. In particular, the Court finds no merit in Plaintiff's contention that an inference of "staging" may be drawn merely from the media's presence at a pre-raid briefing, the Deputy Chief's grant of permission for the Fox 2 television crew to accompany Defendants on their raid (but remain outside the building), and the arresting officers' failure to grant Plaintiff's request that he be taken out a Woodward entrance to the building. The worst that can be said about Defendants' conduct is that it facilitated, rather than hindered, the capture of Plaintiff's arrest on film.[13] This Court agrees with its brethren in *Caldarola* and *Otero* that such conduct is not unconstitutional so long as it serves some legitimate law enforcement purpose—as it plainly did here, where Plaintiff was filmed while being transported to the police station.

■ The Court is quite willing to assume that Plaintiff would have voluntarily cooperated with law enforcement officials if he had not been arrested, and that, even after learning of the order to arrest him, Plaintiff would have submitted to this procedure without the need for the arresting officers to employ handcuffs or any other forcible means whatsoever. The Court further accepts Plaintiff's premise that Defendants' handling of the situation would not have suffered greatly, or perhaps at all, if they had acceded to Plaintiff's request that he be escorted out a different exit rather than led past the camera crew at the Midland Street entrance. What the Court is unwilling to do, however, is to scrutinize the conduct of police officers to ensure that their arrests are performed in some sort of optimal, preferred, or least intrusive manner. All that the Fourth Amendment requires is that arrests be reasonable. Nothing that Defendants did in this case, whether placing Plaintiff in handcuffs or leading him out one entrance versus another, remotely offends this constitutional command, where all of these

---

**13.** Even then, having viewed a videotape of the television coverage of Plaintiff's arrest, the Court notes that this footage was quite brief, and that Plaintiff's back was turned to the camera for the short time that he was shown being escorted to a squad car. Indeed, if Plaintiff had not voluntarily approached the Fox 2 reporter prior to his arrest, a viewer would not have been able to recognize Plaintiff as the person involved in the subsequent "perp walk" footage.

measures are wholly routine police practices. Accordingly, the Court finds that Plaintiff's challenge to the manner of his arrest fails as a matter of law.[14]

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' April 30, 2002 Motion for Summary Judgment is GRANTED

### *ORDER OF DISMISSAL*

The Court having this day entered an Opinion and Order granting Defendants' Motion for Summary Judgment,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that this case be, and hereby is, DISMISSED in its entirety with prejudice.

---

**14.** In light of the Court's conclusions that neither the fact nor the manner of Plaintiff's arrest violated the Fourth Amendment proscription against unreasonable seizures, it necessarily follows that Plaintiff cannot sustain his federal § 1983 claims against the Defendant City of Highland Park. *See, e.g., Scott v. Clay County,* 205 F.3d 867, 879 (6th Cir.2000); *Monday v. Oullette,* 118 F.3d 1099, 1105 (6th Cir.1997). Further, Michigan law broadly shields governmental agencies and municipalities from tort liability in their exercise of governmental functions unless one of the narrowly drawn statutory exceptions applies, *see* Mich. Comp. Laws § 691.1407(1); *Haliw v. City of Sterling Heights,* 464 Mich. 297, 302–03, 627 N.W.2d 581, 584 (2001), and it is clear that the operation of a police department is a governmental function to which no such statutory exception applies, *see Williams v. Payne,* 73 F.Supp.2d 785, 794 (E.D.Mich.1999). Thus, the Defendant City also is entitled to summary judgment in its favor on Plaintiff's state-law tort claims.